355 So.2d 310 (1978)
The HOME INSURANCE COMPANY
v.
M.T. OLMSTEAD and Charline Olmstead.
No. 49980.
Supreme Court of Mississippi.
February 22, 1978.
*311 Watkins & Eager, Velia Ann Mayer, P.N. Harkins, III, Jackson, for appellant.
John G. Corlew, Pascagoula, Frank J. Hammond, Jr., Moss Point, for appellees.
Before INZER, SUGG and WALKER, JJ.
WALKER, Justice, for the Court:
This is an appeal from a judgment entered by the Circuit Court of Jackson County, Mississippi, after a jury verdict in favor of the appellees, M.T. and Charline Olmstead, plaintiffs in the court below, against the appellant, Home Insurance Company. The amount of the judgment was $23,160 in actual damages, plus $4,340 in punitive damages, plus interest at the legal rate on the sum of $16,000 from the date of loss, September 7, 1969.
This case arose out of a fire loss sustained by the Olmsteads on September 7, 1969. Hurricane Camille struck the Mississippi Gulf Coast on August 18, 1969. At the time of Hurricane Camille, the Olmsteads' property was insured by the Hartford Insurance Company through the Davis Insurance Agency in Moss Point, Mississippi. On or about August 20, 1969, the Olmsteads went to the Gary Smith Agency in Pascagoula inquiring about fire insurance on their home. Mrs. Jean Langner, the Smith Agency underwriter for fire insurance, testified that she asked the Olmsteads if they had any damage as a result of Hurricane Camille, and they told her that they did not. Mrs. Langner was not asked at trial if she ever asked the Olmsteads whether they had water in the house from the hurricane.
The Home Insurance Company issued its policy to the Olmsteads on August 21, 1969, which provided $10,000 coverage on the Olmsteads' house and $6,000 on the contents. The policy had a mortgage clause payable to J.C. Wood. By the time of the trial, the mortgage had been paid off and the Olmsteads owed Mr. Wood nothing with respect to the property.
Sometime after noon on Saturday, September 7, 1969, the Olmsteads left their house to spend the weekend with Mr. Olmstead's brother in Fort Walton Beach, Florida. When they returned on Sunday night, all they found was a pile of ashes. It was the testimony of the Olmsteads that the *312 house and all of its contents were destroyed and that they were not able to save anything.
Mr. Olmstead contacted his attorney, Mr. Hammond, who told him to report the fire to their insurance agent. On Monday morning, Mrs. Olmstead went to the Gary Smith Agency and reported the loss. Mr. J.C. Oliver, the adjuster for the Home Insurance Company, testified that he called Mrs. Olmstead on September 13, 1969, and she gave him directions to the house and told him that they had had approximately a foot of water in it from Hurricane Camille. After examining the house site and confirming the high water marks on the property, Mr. Oliver checked with the Davis Agency regarding the possibility of a claim having been made by the Olmsteads under the Hartford policy for damage from Hurricane Camille. Although neither the Hartford nor the Davis Agency could confirm that a claim had been made, someone at the Davis Agency did tell Mr. Oliver that they were of the opinion that a claim had been made for hurricane damage. At the trial, the Olmsteads denied making a claim under the Hartford policy. It was never determined whether or not Mr. Wood, the mortgagee, made a claim.
After discovering the possibility that a claim had been made by the Olmsteads for hurricane damage, Mr. Oliver went back to the Smith Agency and interviewed Mrs. Langner. He submitted all of the information he had to the Home Insurance Company and was instructed by the company to leave a non-waiver agreement at the Smith Agency for the Olmsteads, which he did around the first of October. Mr. Oliver was instructed to suspend his investigation until the Olmsteads executed the non-waiver agreement.
The appellant first assigns as error the refusal by the trial court to grant instruction D-16, which informed the jury that their verdict should be for appellant if they found that the Olmsteads declined to submit to an examination under oath scheduled for February 4, 1970, and did not offer to submit to such an examination until June 14, 1971. The facts relating to this assignment are that on January 16, 1970, Mr. Goodman, the Home's attorney, wrote the Olmsteads a letter, with a copy addressed to Mr. Hammond, the Olmsteads' attorney, demanding that the Olmsteads present themselves at the Jackson County Courthouse in Pascagoula at 11:50 a.m. on Wednesday, February 4, 1970, for an examination under oath. On February 2, 1970, Mr. Hammond called Mr. Goodman on the telephone and told him that the Olmsteads would not be able to make it on February 4, 1970, because they had to go out of town to take care of a sick relative. Mr. Hammond testified that at this time, and on several subsequent occasions, he attempted to make it clear to Mr. Goodman that he was not refusing entirely to submit his clients to the examination under oath, but that his refusal was only limited to February 4, 1970, and they would be available at any reasonable time thereafter. Mr. Hammond admitted, however, that he did not know what Mr. Goodman's understanding was and that he never suggested any specific dates to Mr. Goodman. Mr. Goodman did not testify at the trial.
On February 2, 1970, Mr. Goodman wrote Mr. Hammond confirming their telephone conversation of that date. Mr. Goodman also sent Mr. Hammond a proof of loss form as Mr. Hammond had requested in their telephone conversation. On March 6, 1970, Mr. Hammond wrote a letter back to Mr. Goodman enclosing the signed proof of loss. Mr. Hammond's letter of March 6, 1970, did not mention his offer to have his clients examined under oath after February 4, 1970. On March 9, 1970, Mr. Goodman replied to Mr. Hammond's letter of March 6, 1970, and asked Mr. Hammond to confirm in writing that his clients had refused to submit to the examination under oath on February 4, 1970. Mr. Hammond did not reply to this letter. The first reference to Mr. Hammond's alleged verbal offer was contained in a letter dated June 14, 1971 (16 months after the first scheduled examination) from Mr. Hammond to Mr. Goodman asking Mr. Goodman to advise when the *313 Olmsteads could be examined under oath "[p]ursuant to our previous conversations... ."
On June 16, 1971, Mr. Goodman wrote back to Mr. Hammond stating that his offer to have the Olmsteads examined came too late, that the lapse of sixteen months since the examination was originally requested had resulted in the perishing of any benefits that could have been discovered from the examination demanded on February 4, 1970. The letter stated that it was the position of the Home Insurance Company that the insured by failing and refusing to submit to the examination under oath within a reasonable period of time had wilfully concealed material facts and circumstances relating to the insurance and to the alleged loss and that the Olmsteads were thereby precluded from any right of recovery.
Subsequent attempts to get the Home Insurance Company to reconsider its position proved fruitless and the Olmsteads filed suit on September 3, 1975.
The rule is that the refusal of the insureds to submit to an examination under oath in violation of the express provisions of the insurance policy will result in forfeiture of the insureds' right to recover under the policy and will entitle the insurance company to a peremptory instruction in the trial of an action by the insureds to recover from the insurance company on a policy of fire insurance. Boston Ins. Co. v. Mars, 246 Miss. 36, 148 So.2d 718 (1963).
Further, if an insured, for a valid reason, is unable to attend an examination under oath, it is incumbent upon the insured, as soon as possible, to offer to submit to an examination at a later date. See Standard Ins. Co. of New York v. Anderson, 227 Miss. 397, 86 So.2d 298 (1956); Bergeron v. Employers Fire Ins. Co., 115 Cal. App. 672, 2 P.2d 453 (1931).
Clearly, an issue in this case was whether the Olmsteads, after declining to attend the examination scheduled for February 4, 1970, failed to offer to submit to such an examination until June 14, 1971. Thus, it was error for the trial court to refuse to grant instruction D-16.
The appellant next contends that the trial court erred in instructing the jury that they could award the Olmsteads tort damages, including loss of wages and compensation for mental anguish, and punitive damages, if it was found that the insurance company acted in bad faith in refusing to settle the Olmsteads' claim. We agree.
Such instructions could only have been premised on the assumption that there was an agreement between Messrs. Hammond and Goodman as of February 2, 1970, or shortly thereafter, that the Olmsteads would be available for an examination under oath at a convenient time after February 4, 1970. If there had been such an agreement, then the insurance company's refusal to reschedule the examination and its denial of coverage might amount to bad faith.
However, the evidence does not indicate that there was any such agreement. At most, the evidence indicates a misunderstanding between Messrs. Hammond and Goodman. With respect to his refusal to submit the Olmsteads on February 2, 1970, and his verbal offer to make them available at a later date, Mr. Hammond admitted that he did not "... know how Bill [Goodman] took it." It is clear from Mr. Goodman's letters to Mr. Hammond, all of which mention the refusal of the Olmsteads to submit to the examination on February 4, 1970, but none of which acknowledge anything like an offer to submit as alleged by Mr. Hammond, that Mr. Goodman did not "take it" (their conversation) the way Mr. Hammond intended. In view of Mr. Hammond's admission that he might not have made himself understood by Mr. Goodman, we are of the opinion that the evidence did not warrant granting bad faith instructions and it was error for the trial court to give them.
For the same reason, we are of the opinion that the award of prejudgment interest by the trial court was error. While it is true that prejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally *314 made,[1] we are of the opinion that due to the misunderstanding in this case, prejudgment interest is not appropriate.
This case is a good illustration of the desirability of limiting the imposition of prejudgment interest to those cases where the denial of the claim is frivolous or in bad faith, for not only was the Home's denial not in bad faith, but, in addition, the Olmsteads waited until September 3, 1975, to file suit  just before the statute of limitations ran out. In view of Mr. Goodman's letter to Mr. Hammond of June 16, 1971, in which the Home Insurance Company denied the claim, it would be unjust to hold that the insureds could sit by idly and let the interest run up for four years before filing suit. We say this fully aware of Mr. Hammond's explanation that he waited so long to file suit because he thought that Mr. Goodman was trying to get the company to reconsider its position. In the absence of any correspondence between Messrs. Hammond and Goodman following Mr. Goodman's letter of June 16, 1971, and of any testimony concerning conversations between the two subsequent to their telephone conversation following Mr. Hammond's receipt of the letter of June 16, 1971, it was not reasonable for Mr. Hammond to assume that Mr. Goodman would continue to pursue the matter for four years.
The Home Insurance Company's final argument is that the trial court erred in instructing the jury that the burden was on the Home Insurance Company to prove that the Olmsteads wilfully concealed and misrepresented material facts concerning the issuance of the policy. The Home Insurance Company cites no cases in support of its argument. In Interstate Life & Accident Ins. Co. v. Smith, 260 So.2d 453 (Miss. 1972), we stated that the burden is on the insurer to establish an affirmative defense relied upon to work a forfeiture of the insurance contract. Thus, there was no error by the trial court in this regard.
For the foregoing reasons, we are of the opinion that the judgment of the lower court must be reversed and the cause remanded for a new trial.
REVERSED AND REMANDED FOR A NEW TRIAL.
PATTERSON, C.J., INZER and SMITH, P. JJ., and ROBERTSON, SUGG, BROOM, LEE and BOWLING, JJ., concur.
NOTES
[1] Farm Mutual Auto Ins. Co. v. Bishop, 329 So.2d 670 (Miss. 1976); Commercial Union Ins. Co. v. Byrne, 248 So.2d 777 (Miss. 1971).