**MERCHANTS & MARINE BANK, Plaintiff-Appellant Cross-Appellee,**

v.

**DOUGLAS–GUARDIAN WAREHOUSE CORPORATION, Defendant-Appellee Cross-Appellant.**

No. 85–4554.

United States Court of Appeals, Fifth Circuit.

Oct. 6, 1986.

Frank A. Wood, Jr., John G. Corlew, Jackson, Miss., for appellant.

John M. Harral, Gulfport, Miss., for appellee.

Before WISDOM, W. EUGENE DAVIS and EDITH HOLLAN JONES, Circuit Judges.

## OPINION

EDITH HOLLAN JONES, Circuit Judge:

This appeal requires us to determine the rights and obligations of parties under a tri-party "Verified Inventory Control Agreement." We agree with the magistrate's construction of the contract and affirm the court's award of damages, but we reverse the award of prejudgment interest.

Merchants & Marine Bank provided Marine Steel with a $350,000 line of credit in exchange for a security interest in, *inter alia,* the borrower's steel inventory. To police its collateral, on May 31, 1974, Douglas-Guardian entered into a tri-party agreement with the Bank and Marine Steel Corporation wherein Douglas-Guardian agreed to monitor the "declared value" of Marine Steel's inventory so that it would continuously meet or exceed the Bank's requirements. Under this agreement, Douglas-Guardian agreed to deliver to the Bank various regular reports setting forth the value of Marine Steel's inventory "computed at values designated" by Marine Steel. The Bank was to furnish Douglas-Guardian with a "minimum hold" figure which was to be kept in inventory at all times. The agreement further provided that Douglas-Guardian "shall have no responsibility for values designated by" Marine Steel.

To carry out its responsibilities under the contract, Douglas-Guardian established a field warehouse at Marine Steel's plant on property leased from F.B. Walker & Sons, Inc., an entity related to Marine Steel. The field warehouse consisted of an area of fenced-in property in which Marine Steel's steel inventory was secured by a locked gate to which Douglas-Guardian was supposed to have the only key. Douglas-Guardian employed various custodians or bonded representatives to supervise the inventory control procedures. The weekly valuation certificates, monthly reports, and semi-annual inventories presented to the Bank were the exclusive responsibility of Douglas-Guardian and its bonded representatives.

Almost until the close of the tri-party inventory control agreement, Douglas-Guardian's reports certified that the "declared value" of Marine Steel's inventory exceeded the $210,000 "minimum hold" figure established by the Bank. The last monthly valuation, received by the Bank on October 13, 1977, reported a "declared value" in inventory of $215,210.87. However, inventories taken by Douglas-Guardian on October 5 and 7 after the closing of the field warehouse on September 27, 1977, revealed a declared value of only $205,-990.62, $4,009.38 short of the minimum hold figure. At the same time, Marine Steel defaulted on its obligation to the Bank and owed the Bank $162,000, exclusive of interest and other charges. The Bank foreclosed on the steel inventory.

The Bank then independently calculated the value of the inventory remaining in the field warehouse as of October 6 or 7 and discovered that the handbook value was only $117,290.33. The discrepancy evidently resulted from inflated weights apparently submitted to Douglas-Guardian by Marine Steel. Under the inventory control agreement, Douglas-Guardian was to determine the "value" of the steel based on "values" designated by Marine Steel. The contract failed to designate which component of value—price, weight, or number of pieces—Marine Steel was to determine. Douglas-Guardian had accurately counted the number of pieces of steel in the inventory, and Marine Steel accurately reported the prices for the various pieces of steel. The problem resulted from the designation of weights. Douglas-Guardian sometimes obtained the weights of various types of steel from an industry handbook. At other times, it appears that weights were supplied to Douglas-Guardian by Marine Steel. When the weights were supplied by Marine Steel, they were often doubled, substantially inflating the "declared value" of the inventory. These "false weights" accounted for the difference between the "declared

value" of $205,990.62, and the actual or steel handbook value of $117,290.33.

Merchants & Marine Bank filed this action in Mississippi state court. Douglas-Guardian removed the case to the district court, where both parties consented to a bench trial before a magistrate. The magistrate found that Douglas-Guardian negligently breached the tri-party inventory control agreement by allowing the value of Marine Steel's inventory to fall below the Bank's minimum hold figure. The magistrate rejected Douglas-Guardian's defensive assertion of the Mississippi six-year statute of limitations and impliedly rejected Douglas-Guardian's contention that the Bank was contributorily negligent in failing to discover the overstated value of the inventory. In calculating the Bank's damages, the magistrate relied on the fundamental premise that, in breach of contract cases, the aggrieved party is entitled to be put in the same position he would have enjoyed if the contract had been performed as agreed. Here, the Bank received $30,-000 at the foreclosure sale for steel with a handbook value of $117,290.33—26% of the steel's handbook value. If $210,000 worth of steel valued at the handbook price had been maintained by Douglas-Guardian, the Bank, at a foreclosure sale, would still have received only 26% of the total, or $54,600. The magistrate then subtracted the $30,000 which the Bank had recovered at the foreclosure sale and awarded the Bank $24,600. The magistrate attributed this relatively low recovery to the "Bank's failure to take into account, in establishing the minimum hold figure, the fact that a forced sale of the steel would bring a lower price than the fair market value of the steel." The magistrate also awarded prejudgment interest from October 7, 1977. Both sides have appealed.

### Statute of Limitations

Douglas-Guardian asserts that the Bank's cause of action accrued when Douglas-Guardian first submitted an inventory valuation certificate or report based on a false weight. Douglas-Guardian argues that, even though the witnesses at trial were unable to establish when or how the weight falsification occurred, it is apparent that it happened at some point prior to February 1977, because blatant discrepancies exist between the July 1976 and the February 1977 inventories. Thus, the Bank's suit, filed on September 27, 1983, was not filed within the Mississippi six-year general statute of limitations. See Miss. Code Ann. § 15–1–49 (1972).

■ The magistrate found a continuing breach of the contract, the last event of which occurred on October 6, 1977, when Bank first had notice that Douglas-Guardian's reports were inaccurate. We do not find the magistrate's determination with respect to the accrual of the Bank's cause of action clearly erroneous. See Fed.R. Civ.P. 52(a). The witnesses could not explain when, or even how, the falsification of weights had occurred. Thus, each time that a false report was submitted to the Bank, a separate but ongoing breach of the Verified Inventory Control Agreement occurred. Due to the persistence of the errors, the Bank had no reason to suspect a breach prior to October 6. On this basis, we agree that there was a continuing violation and that the Bank's cause of action did not accrue until it discovered the inventory shortage on October 6, 1977. The Bank's action, filed on September 27, 1983, was timely.

### Liability and Damages

Douglas-Guardian asserts that there was no breach because, under the inventory control agreement, the "values" of the steel, both in price and weight, were to be designated by Marine Steel and Douglas-Guardian assumed no responsibility for the accuracy of those values. The Bank responds that "value" means "price" and that Douglas-Guardian had the obligation to determine the "value" of the inventory by taking the prices designated by Marine Steel and multiplying them by the number of pieces in the inventory times the weight of the steel as stated by the steel handbook

generally used in the industry. Douglas-Guardian's position is untenable.

■ The term "value" is not defined in the contract. This ambiguity will be construed strongly against the drafter of the contract, here Douglas-Guardian. *See Nicholas Acoustics & Specialty Co. v. H & M Constr. Co.*, 695 F.2d 839, 843 (5th Cir. 1983) (applying Mississippi law); *Owen v. Gerity*, 422 So.2d 284, 288 (Miss.1982). The magistrate found that "[i]f Douglas's arguments were accepted by the Court, these weekly certificates meant absolutely nothing; the monthly valuation reports would mean absolutely nothing. Douglas would have been paid to mail to the Bank the borrower's statement of its inventory value." The magistrate concluded that "[i]f 'values' were to be designated by the borrower, the only logical application of that term would be to the price of the steel." The magistrate's finding in this respect is not clearly erroneous.

■ The prices of steel were furnished to Douglas-Guardian by Marine Steel. The number of pieces of steel in the inventory was determined by reference to an index file which was allegedly maintained by the bonded representative of Douglas-Guardian. The uncontroverted testimony of one of these bonded representatives, however, reveals that this index file was also Marine Steel's inhouse inventory. In order independently to determine the "value" of the inventory to ensure that it met or exceeded the minimum hold figure, Douglas-Guardian had only to find the proper weight of the plate and angle steel in a steel handbook which was generally used in the industry and multiply that weight by the price and the number of pieces of steel. Requiring any less of Douglas-Guardian would eliminate the need for its services.

Neither Douglas-Guardian nor any of the succession of four bonded representatives had any experience in the steel industry.

Furthermore, contrary to the testimony of a Douglas-Guardian employee, one of its bonded representatives, George Touart, testified that he understood that he was supposed to determine the weight of the steel based on the weights presented in the steel handbook. However, he was not the only person who calculated the "declared value" of the inventory. Preparation of the semi-annual physical inventory was conducted by him in conjunction with the president of Marine Steel, the bookkeeper for Marine Steel and F.B. Walker & Sons, and the bookkeeper's husband. Those individuals also supplied weight figures for the inventory valuations. Touart testified that when he calculated the value of the inventory, his value was correct based on the weights stated in the steel handbook; he did not check the weights when the other individuals calculated the values. Based on these facts, the magistrate's finding that Douglas-Guardian negligently breached its contract to maintain the minimum hold figure established by the Bank is not clearly erroneous. The magistrate's award of damages based on breach of contract must, therefore, be sustained.

■ The Bank, while defending the magistrate's assessment of liability against Douglas-Guardian, nevertheless contests the amount of damages. The Bank argues that Douglas-Guardian was a warehouseman or bailee and that, pursuant to Article 7 of the Uniform Commercial Code, *see* Miss.Code Ann. § 75–7–101 *et seq.* (1981), it was entitled to the fair market value of the steel at the time of the loss or conversion. We need not address the interesting issue posed by the Bank concerning the applicability to this contractual arrangement of the warehouseman's duties under U.C.C. Article 7, because even if its field warehousing arrangement with Marine Steel and Douglas-Guardian fit the standard pattern,[1] the warehouseman's duty extends

---

1. Unlike the standard field warehousing arrangement, Douglas-Guardian did not issue certificates of title to the steel inventory to the Bank as lender or the purchasers of the inventory. Compare *In re Covington Grain Co.*, 638 F.2d 1362, 1365 (5th Cir.1981). *See White & Summers*, Uniform Commercial Code 704–09 (1975). Douglas-Guardian's witness testified he had never seen a triparty arrangement like this one, which appears to have been tailored specif-

only to protecting against loss or destruction of the bailed goods. Miss.Code Ann. § 75–7–204(1) (1981). In this case, the steel inventory was neither lost nor destroyed.[2] Rather, the issue is whether Douglas-Guardian failed to perform the parties' contract pursuant to Douglas-Guardian's separate contractual obligation to certify value. The Bank cites no case equating breach of this duty with "loss" or "conversion" of bailed goods. As we perceive no basis to apply the Article 7 standard to this contractual provision, we concur in the magistrate's assessment of damages based on ordinary contract principles.

### Contributory Negligence

Douglas-Guardian asserts that the Bank's recovery should be limited by the amount of the Bank's contributory negligence. Specifically, Douglas-Guardian argues that the Bank failed to read the contract, failed to read the inventory valuation certificates, and never verified the value of the inventory or the figures submitted to it by Douglas-Guardian. The magistrate did not address the contributory negligence issue and, thus, impliedly rejected this defense.

■ We find Douglas-Guardian's assertions frivolous. Ellzey Burch, the Executive Vice-President of Merchants & Marine Bank and the officer responsible for the loan, testified that the President of the Bank read the contract and authorized his signature prior to entering into the agreement. The testimony of Ellen Cole, a loan supervisor at the bank, indicated that as each inventory valuation certificate came into the Bank, she examined it to ensure that the "minimum hold" figure was met each week and that she compared the weekly certificate against the monthly re-

ports and never found a discrepancy. Further, the Bank had no obligation to "verify" the inventory valuation certificates and reports. That was the sole responsibility of Douglas-Guardian and, in fact, was the principal purpose of the contract entered into between the parties. Accordingly, assuming that the bank could somehow be considered "contributorily negligent" in a breach of contract action, we find no such fault on the part of the Bank here.

### Prejudgment Interest

Under Mississippi law, an award of prejudgment interest rests in the discretion of the awarding judge. *Aetna Cas. & Sur. Co. v. Doleac Elec. Co.*, 471 So.2d 325, 331 (Miss.1985); *Glantz Contracting Co. v. General Elec. Co.*, 379 So.2d 912, 918 (Miss.1980). Prejudgment interest is, however, generally not allowed when the amount allegedly due is unliquidated. *See Doleac Elec.*, 471 So.2d at 331; *Home Ins. Co. v. Olmstead*, 355 So.2d 310, 313–14 (Miss.1978).

Here, the magistrate gave no basis for its award of prejudgment interest. On appeal, the Bank asserts that the award of prejudgment interest was proper because the true dispute between the parties centered on liability, not the amount of the loss. We find this position to be without merit.

■ We recognize that prejudgment interest is not automatically foreclosed in every case in which the claim is unliquidated. *See, e.g., Commercial Union Co. v. Byrne*, 248 So.2d 777, 783 (Miss.1971). However, where, as here, the fact of liability was vigorously disputed, the claim was clearly unliquidated, the magistrate gave no basis for his award of prejudgment in-

---

ically to protect the Bank's duly perfected Article 9 floating lien. *See also* Vaughn, Warehousing Security Transactions: Progeny of *Twyne's Case,* 20 Baylor L.Rev. 1 (1968).

**2.** In *Sumitomo Bank of California v. Product Promotions, Inc.,* 717 F.2d 215 (5th Cir.1983), a substantial shortage of inventory occurred during the period after the bank foreclosed on the warehoused goods, rendering the warehouse-

man liable for conversion. The debts had wrongfully removed the inventory, that case is distinguishable from the instant situation, in which, because of Douglas-Guardian's consistent slovenliness in pricing the "value" of the collateral, there may never or rarely have been collateral sufficient to comply with the Bank's "minimum hold" figure. Douglas-Guardian's breach was one of accounting rather than of custodial.

terest, and the Bank waited until "just before the statute of limitations ran out," *Olmstead*, 355 So.2d at 314, we find that the magistrate abused his discretion in permitting such an award.

Accordingly, the award of damages is AFFIRMED but the award of prejudgment interest is REVERSED.