United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 21, 2004**

Charles R. Fulbruge III
Clerk

REVISED MAY 18, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-60348
_____

In The Matter Of: BILOXI CASINO BELLE INC

Debtor

---------------------------------------------

FIRST AMERICAN TITLE INSURANCE CO

Appellant

v.

FIRST TRUST NATIONAL ASSOCIATION

Appellee

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____

Before KING, Chief Judge, and JONES and SMITH, Circuit Judges.

KING, Chief Judge:

The bankruptcy court held that the title insurance policy issued to Appellee First Trust National Association ("First Trust") insured First Trust's security interest in a casino boat being constructed at a location remote from the insured land where the boat would eventually be moored. The district court

affirmed.  Finding that the policy does not provide coverage, we reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This insurance coverage dispute has its roots in Belle Casinos, Inc.'s ("BCI's") failed effort to build two gambling developments in Mississippi.  Since 1990, the state has permitted gambling on riverboat casinos located on the waters of the Mississippi River and on vessels moored in the coastal waters south of the state's three southern-most counties.  See, e.g., MISS. CODE ANN. §§ 19-3-79, 75-76-1 et seq., 87-1-5, 97-33-1 (2003).  BCI and its wholly owned subsidiary Biloxi Casino Belle, Inc. ("BCBI") planned to operate one casino along the Mississippi River in Tunica and the other casino along the waterfront in Biloxi.  The Tunica casino boat was to be constructed on-site, but the Biloxi boat--named the "Biloxi Belle II"--was to be built some miles away in Gulfport and then floated to Biloxi, where casino-related improvements and structures would be built on the waterfront parcels that had been leased for this purpose.

To finance the casino projects, BCI issued $75 million in mortgage notes underwritten by Bear Stearns & Co.  The notes were issued pursuant to an indenture executed between BCI as issuer and First Trust as indenture trustee for holders of the mortgage notes.  BCI loaned the proceeds of the mortgage notes to BCBI, and in return BCBI gave BCI a promissory note.  To secure the

2

loan, BCBI executed in BCI's favor a Leasehold Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents ("Leasehold Deed of Trust") on the Biloxi project, as well as various other security instruments. The Leasehold Deed of Trust gave BCI security interests in most of the realty (including fixtures) and personalty associated with the casino project, including "ships" and "boats." BCI assigned its interests in these instruments to First Trust, the indenture trustee.

BCBI deposited the proceeds of the loan into two escrow accounts at First National Bank of Commerce ("First National Bank") under a Disbursement and Escrow Agreement between BCI as lender, BCBI as borrower, and First National Bank as escrow agent. BCI's rights under this Disbursement and Escrow Agreement were likewise assigned to First Trust.

The deal documents contemplated several devices that would protect the interests of First Trust (and ultimately the interests of the holders of the mortgage notes for whom First Trust acted as indenture trustee). The documents required contractors' performance bonds, for instance, and provided that contractors would execute lien waivers. Importantly, they also called for First Trust to acquire title insurance from Appellant First American Title Insurance Company ("First American Title") to insure (at least some of) the interests securing the loan that was paying for the construction of the casino project. As noted

3

earlier, the Leasehold Deed of Trust and other security instruments gave First Trust a security interest in almost all of the property, both real and personal, associated with the Biloxi casino project. The key issue in this case is whether the title insurance policy covers only First Trust's security interests in the realty component of the project or instead whether the policies also protect First Trust's security interests in the Biloxi Belle II while it was being constructed.

First Trust was not directly involved in the negotiations leading to the issuance of the title insurance policies but instead left the matter to Bear Stearns, which in turn was represented by the law firm of Gibson, Dunn & Crutcher. First American Title was represented by David Wheeler, a Biloxi-based attorney. Wheeler gave First Trust a binding commitment to issue title insurance on or around October 12, 1993, the closing date of the loan transactions described above. About a month after the closing, Wheeler sent Gibson Dunn a copy of the policies. The title insurance policy at issue here is the 1990 version of the standard-form Loan Policy developed by the American Land Title Association.[1] The policy insured First Trust against, _inter alia_, losses that would occur if another lien (including in some cases a mechanic's lien) took priority over First Trust's

---

[1] The American Land Title Association and the Dixie Land Title Association have both filed amicus briefs in this case, in support of First American Title.

4

insured security interest. The policy also obligated the insurer to pay expenses associated with defending the title and the insured security interest. Attached to the standard forms were several schedules and endorsements that set forth policy-specific details. Of particular note is Item 4 on Schedule A, which identified "the instruments creating the estate or the interest in real estate which is hereby insured." In the original version of the policy that Wheeler sent to Gibson Dunn, Item 4 cross-referenced a rider that listed not only the Leasehold Deed of Trust--which all sides agree was supposed to be listed--but also various financing statements (Mississippi form UCC-1) that described, using language generally the same as that used in the Leasehold Deed of Trust, many broad categories of BCBI personalty and fixtures in which First Trust held a security interest. Like the Leasehold Deed of Trust, the UCC-1 forms cover "ships" and "boats." The attachments to the UCC-1s included descriptions of the real property associated with the casino project, and the forms were recorded in the county deed-of-trust books.

In the months that followed Gibson Dunn's receipt of the insurance policy, Gibson Dunn and Wheeler corresponded regarding numerous corrections to the forms. In April 1994, Wheeler sent the revised pages of the policy to Gibson Dunn. In addition to making the changes requested by Gibson Dunn, Wheeler noted that the revised copy eliminated the reference to the UCC-1 financing statements, leaving the Leasehold Deed of Trust as the only

5

document listed in Schedule A, Item 4.  In the current litigation, the parties take sharply differing views of how to characterize these exchanges.  According to First American Title, the commitment documents negotiated by the parties concerned only land, and the inclusion of the financing statements in the initial version of the policy documents was simply a drafting mistake that Wheeler corrected with Gibson Dunn's approval.  According to First Trust, in contrast, the inclusion of the UCC-1s was not a mistake at all, since the title insurance policies were always intended to cover more than just the real estate associated with the Biloxi project.  Or, says First Trust, if their inclusion was initially a mistake, Wheeler could not amend the policy without First Trust's consent, which the Gibson Dunn attorneys did not give him and were not authorized to give him.  In any event, it seems that First Trust only saw the later version of the policy and did not learn of the initial version until years later when, in connection with this case, First American Title submitted it as an attachment to its complaint.

Meanwhile, construction of the casino boats was running over budget.  The contractor for the casino boats, Charles N. White Construction Company ("White Construction"), continued to receive payments from the accounts at First National Bank despite the overruns.  First Trust eventually put a stop to the payments and later sued First National Bank for alleged incompetence in the

latter's role as disbursement and escrow agent.[2]  White
Construction, which now claimed that it was still owed payments
for work it had already performed, filed a Mississippi statutory
watercraft lien on the still-uncompleted Biloxi Belle II in June
1994.  The next month, White Construction sued BCI in Mississippi
state court to enforce its lien.  BCI and BCBI then filed Chapter
11 bankruptcy petitions in August.  A number of lawsuits among
BCI, BCBI, First Trust, White Construction, and the principals of
various of those parties ensued over the course of the next few
years.

One paragraph of White Construction's watercraft-lien
complaint against BCI listed First Trust as a party that had a
potentially competing interest in the Biloxi Belle II.  In
October 1994, First Trust sent First American Title a letter
giving notice of the lawsuit.  First American Title acknowledged
the letter the next month and expressed its understanding that
First Trust was not requesting a defense.  Some two years later,
in December 1996, First Trust requested a defense in the White
Construction litigation, which had by now been removed to federal
court and referred to the bankruptcy court.  First American Title
agreed to provide a defense, but under a reservation of its
rights to deny coverage.  First Trust rejected First American

_____

    [2]    The litigation eventually reached this court and is
further described in First Trust National Ass'n v. First National
Bank of Commerce, 220 F.3d 331 (5th Cir. 2000).

7

Title's tendered counsel, however, asserting that the reservation of rights created a conflict of interest. First Trust wanted First American Title to pay for counsel of the former's choice. First American Title therefore filed an adversary complaint in the bankruptcy court in March 1997, seeking a declaratory judgment that it was not responsible for any losses or expenses associated with White Construction's claims against First Trust. First Trust counterclaimed, seeking payment of its expenses in defending against White Construction's claims and indemnification for any losses that would occur if White Construction's lien primed First Trust's security interest in the Biloxi Belle II.

Most of the litigation stemming from the failed casino projects came to a close in July 1997 with the filing and the bankruptcy court's approval of the BCI/BCBI Amended Joint Liquidating Plan (the "Plan"). Under the Plan, White Construction received $1.7 million for its claims. The insurance coverage dispute between First Trust and First American Title continued, however. In August 1999, the bankruptcy court granted First American Title's motion for partial summary judgment, absolving First American Title of any liability for litigation expenses incurred before First Trust's December 1996 request for a defense. In March 2000, the parties filed cross-motions for summary judgment regarding First American Title's liability for First Trust's post-December 1996 defense expenses and the $1.7 million paid to White Construction, money that otherwise would

8

have gone to First Trust's noteholders.  The bankruptcy court

denied First American Title's motion, granted First Trust's

motion, and awarded First Trust over $1.4 million.[3]  First

American Title appealed the bankruptcy court's decision to the

district court, which affirmed the bankruptcy court's judgment in

all respects.  First American Title now appeals to this court.[4]

## II. ANALYSIS

The bankruptcy court granted First Trust's motion for

summary judgment and denied First American Title's cross-motion.

We review the decision de novo.  See Williams v. Int'l Bhd. of

Elec. Workers, Local 520 (In re Williams), 298 F.3d 458, 461 (5th

Cir. 2002).  Summary judgment is appropriate when there is no

---

[3]     This amount is composed of the $1.7 million that White
Construction received under the Plan, plus interest of
approximately $300,000, plus $222,000 in post-December 1996
litigation expenses, less $800,000 that First Trust received from
Chicago Title Insurance Company for certain claims related to the
Tunica project.

[4]     Bankruptcy jurisdiction exists under 28 U.S.C.
§ 1334(b) in this case because White Construction settled its
lien priority litigation against First Trust in exchange for
First Trust's assignment of any recovery in this case to the
BCI/BCBI liquidating trust (of which First Trust is liquidating
trustee) for the benefit of unsecured creditors.  See Citizens
Bank & Trust Co. v. Case (In re Case), 937 F.2d 1014, 1016-20
(5th Cir. 1991) (upholding bankruptcy jurisdiction over a suit on
a note that the debtor executed as part of the bankruptcy plan's
settlement of existing debts).  The suit thus "pertain[s] to the
implementation or execution of the plan," Bank of La. v. Craig's
Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.), 266
F.3d 388, 390 (5th Cir. 2001).  Jurisdiction does not exist
merely by virtue of the fact that an asset of the bankruptcy
estate (namely the Biloxi Belle II) is the subject of this
insurance coverage dispute.

genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); BANKR. R. 7056 (applying Rule 56 to adversary bankruptcy proceedings).

First American Title offers several different theories according to which we might reverse the judgments below.  It argues that coverage is barred by Exclusion 3(a) of the policy because First Trust created White Construction's lien by mismanaging disbursements from the escrow accounts, and it additionally claims that First Trust never gave proper notice of White Construction's claims.  For its part, First Trust denies those contentions.  Most of the parties' energies, however, are devoted to the language of the title insurance policy, and we find that we can decide the case on that basis.

Under Mississippi law, which the parties agree applies to this contract, the plain terms of an insurance policy are enforced as written.  See Lewis v. Allstate Ins. Co., 730 So. 2d 65, 68 (Miss. 1998).  If, however, the terms are ambiguous, then doubts are resolved against the drafter and in favor of coverage. See J&W Foods Corp. v. State Farm Mut. Auto. Ins. Co., 723 So. 2d 550, 552 (Miss. 1998).[5]  A policy is ambiguous if it "can be

_____

[5]  It is sometimes said that the usual rule of construing ambiguities against the insurer should have less force in the context of title insurance loan policies, since those policies were originally created by the lenders, not the title insurers. See Michael F. Jones & Rebecca R. Messall, Mechanic's Lien Title Insurance Coverage for Construction Projects: Lenders and Insurers Beware, 16 REAL EST. L.J. 291, 306-07 (1988). Mississippi law does not appear to have recognized such an

10

interpreted to have two or more reasonable meanings." Id. Here, we believe that the title insurance policy is unambiguous on the question whether First Trust's interests in the casino vessel being constructed in Gulfport are covered.

First Trust's asserted basis for coverage is the policy's seventh insuring clause. That portion of the policy states that

> First American Title Insurance Company . . . insures . . . against loss or damage . . . incurred by reason of:
>
> . . .
>
> 7.  Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material . . . arising from an improvement or work related to the land . . . .

(emphasis added).

One point of contention in this case is whether White Construction's lien arose from an improvement or work "related to the land." According to the policy, the "land" means "the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property" but does not include property beyond the bounds of the area described in Schedule A. First Trust contends that construction of the casino boat, which was to be moored next to the land in Biloxi indefinitely, is "related to the land," while First American Title, emphasizing that the unfinished boat never left Gulfport

exception to the usual rule, however. In any event, we conclude that the policy is unambiguous, so we do not employ this rule of construction in this case.

11

and allegedly was not intended to be a fixture, argues that it is not "related to the land."  That is, the parties dispute whether White Construction's lien is the type of risk that is covered under insuring clause 7.  But coverage would also be unavailable under the policy if the interest said to be insured--namely, First Trust's security interest in the Biloxi Belle II--is not within the term "insured mortgage."  We find this latter inquiry to be determinative of the case.

The "insured mortgage" for purposes of this particular policy is specified by reference to Schedule A, the customized schedule that sets forth policy-specific matters such as the amount of the policy, the effective date, and so forth.  For present purposes, the crucial part of Schedule A is Item 4, which states:

> 4.    The instruments creating the estate or the interest in real estate which is hereby insured are described as follows:

SEE ATTACHED RIDER

When one turns to the attached rider, one finds first a reference to the Leasehold Deed of Trust executed between BCI and BCBI and later assigned to First Trust.  As described earlier, in the first version of this rider, but not in the later version, there are also references to several UCC-1 financing statements and other documents.  The financing statements describe First Trust's security interest in various items of BCBI's property, including

12

the Biloxi Belle II, and they also attach descriptions of the Biloxi parcels.

The parties sharply disagree over whether the later version of the policy is the legally effective version or is instead a failed attempt to amend the earlier, legally binding policy. If the first version of the policy--the version that includes the references to the UCC financing statements--is the binding version of the insurance policy, then (says First Trust) there can be no doubt but that First Trust's interest in the casino boat is insured under the policy. First Trust also argues, however, that its security interest in the casino boat is covered even without the UCC financing statements; in so arguing, First Trust relies on the fact that the Leasehold Deed of Trust gives it a security interest in the casino boat (along with much other BCBI property) as well as in the land. First American Title argues that First Trust's security interest in the casino boat-- which is not an interest in land--is not covered under either version of the policy.

We hold that the title insurance policy does not cover First Trust's security interest in the casino boat being constructed in Gulfport. Even if Wheeler did not successfully change the rider to remove the references to the UCC financing statements, First Trust's security interest in the boat and all of the other personalty described in the financing statements cannot be the "insured mortgage" that the title insurance policy protects.

13

Tellingly, Item 4 on Schedule A specifies the insured mortgage by referring to "[t]he instruments creating the estate or the interest in real estate which is hereby insured." This language poses two serious problems for First Trust's attempt to use the UCC-1s to bring the boat within the policy.

First, the language refers to "the estate or the interest <u>in real estate</u>." The Biloxi Belle II, under construction on a barge in Gulfport, was not real estate.[6] It is conceivable, we suppose, that the qualifier "in real estate" could be read to

_____

[6]     Mississippi law provides that otherwise-prohibited gambling is legal when it is conducted on a "cruise vessel" located in the waters south of Mississippi's three southern-most counties or on a "vessel" located along the Mississippi River. <u>See</u> MISS. CODE ANN. §§ 87-1-5, 97-33-1. A "cruise vessel" like the Biloxi Belle II must satisfy certain Coast Guard regulations. <u>Id.</u> § 27-109-1. Although the Biloxi Belle II would not go anywhere in the course of its normal gaming operations, it would be capable of being unmoored and towed away if necessary. It seems unlikely that the Biloxi Belle II would have become a fixture even when it was moored along the Biloxi waterfront--though the record is not well developed on this point--but in any event the boat undisputably never was so affixed. The situation can be quite different with respect to the casino "vessels" located along the Mississippi River, which can be somewhat less boat-like. <u>See</u> <u>id.</u> (distinguishing between "vessel" and "cruise vessel"); <u>see also</u> Ben H. Stone et al., <u>Site Approval of Casinos in Mississippi--A Matter of Statutory Construction, or a Roll of the Dice?</u>, 64 MISS. L.J. 363 (1995) (explaining the differences between the regulatory regimes governing the two types of casinos). Therefore, the apparent admission of a First American Title agent that the company has insured at least two casinos along the Mississippi River is inapposite. Indeed, the deposition pages to which First Trust directs us actually undercut First Trust's argument in that the agent states that the two casinos were insurable because they were built directly on the land and were "pretty much fixture[s]." The agent also said that the boats had to be specifically identified as covered "because it's kind of excluded by the terms of the policies."

14

apply only to "interest" but not "estate," so that Item 4 would insure instruments creating an "interest in real estate" but an "estate" in any type of property.  But by far the more natural reading is that "in real estate" modifies both "estate" and "interest."  The language thus embraces fee estates, leasehold estates, security interests, and so on, as long as those property interests are in real estate.  This reading is powerfully confirmed, moreover, when one considers other portions of the policy, which give no indication of an intent to cover interests in personalty and every indication of insuring interests in land.  Cf. J&W Foods Corp., 723 So. 2d at 552 (explaining that the court should consider the whole insurance policy, construing one clause in light of others).  From the insuring clauses to the exclusions to Schedule A, the policy is replete with references to "land" and "real property."  But those same provisions contain no references to "chattels," "goods," "movables," "personalty," or "personal property."  The only impression an objective reader of the policy can come away with is that the document is firmly tied to terra firma.[7]

_____

[7]    In a sense, this is hardly surprising, as this is a title insurance policy.  Title insurance is usually defined in terms of real estate.  See, e.g., BLACK'S LAW DICTIONARY 808 (7th ed. 1999); 1 ERIC MILLS HOLMES & MARK S. RHODES, HOLMES'S APPLEMAN ON INSURANCE 2D § 1.31 (1996).  But we are mindful of the limitations of the ready bromide that title insurance covers only interests in real estate.  Cf. LA. REV. STAT. ANN. § 22:2092.2(18) (West Supp. 2004) (defining "title insurance policy" as potentially encompassing either "movable or immovable property").  In particular, First Trust explains that Chicago Title Insurance

15

The second problem that confronts First Trust's theory is that Item 4 refers to "[t]he instruments <u>creating</u> the estate or the interest in real estate." A UCC-1 financing statement is not a document that creates a security interest in any type of property. On the contrary, it is a method of giving <u>notice</u> of the existence of a security interest created by a security agreement. <u>See, e.g.</u>, <u>First Bank v. E. Livestock Co.</u>, 837 F. Supp. 792, 797, 799 (S.D. Miss. 1993) ("A financing statement does not create a security interest . . . . [T]he sole function of financing statements under the U.C.C. is to put third parties--usually prospective buyers or lenders--on notice that there may be an enforceable security interest in the property of the debtor."); BLACK'S LAW DICTIONARY 646 (7th ed. 1999). Insuring clause 7, which insures "the priority of the lien of the insured mortgage," does not insure the lien of a financing statement, for such a document, unlike a mortgage or other security agreement, effects no lien.

Given the above considerations, we find unavailing First Trust's reminder that the policy's general definition of "mortgage" tells us that the term can mean "mortgage, deed of

---

Company must not have been aware of this platitude, for the company sold in Mississippi in the recent past a "UCC-9" policy that protected security interests in personalty arising under Article 9 of the UCC. The policy at issue in this case, however, is not an innovative UCC-9 policy but is instead a traditional, mundane lender's title insurance policy. Some policies offered by traditional title insurers might cover interests in personalty, but this one does not.

trust, trust deed, or other security instrument."  That definition, First Trust urges, is broad enough to encompass instruments that create security interests in personal property like the Biloxi Belle II.  Mortgages, deeds of trust, and trust deeds are all generally understood to refer primarily (even if not always exclusively) to documents that create security interests in land.  Under the canon of ejusdem generis,[8] one could perhaps argue that "other security instrument" should be restricted similarly.  Nonetheless, even assuming that the policy's definition of the term "mortgage" could include documents creating security interests in personalty, what is controlling here is that the policy provides protection not for "mortgages" in general but only for the particular policy's "insured mortgage."  And, as we explained above, the "insured mortgage" under this policy can only be an instrument that creates an interest in real estate, or else the whole policy would be rendered mysterious.  Accordingly, the reference to the UCC-1 financing statements in the initial copy of the policy cannot reasonably be thought to bring the Biloxi Belle II within the coverage of the policy.

---

[8] "Under the doctrine of 'ejusdem generis,' where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated."  Rhoden v. State Farm Fire & Cas. Co., 32 F. Supp. 2d 907, 912 (S.D. Miss. 1998) (citing Cole v. McDonald, 109 So. 2d 628, 637 (1959)), aff'd, 200 F.3d 815 (5th Cir. 1999) (table).

17

Although First American Title has strenuously disavowed the inclusion of the UCC-1s, in the end their inclusion does not make as great a difference as one might suppose. This is because the Leasehold Deed of Trust, admittedly a part of every version of the policy, creates in First Trust's favor a security interest in much of BCBI's personalty as well as in its real property. (The full title of this wide-ranging document, the reader will recall, is "Leasehold Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents.") First Trust accordingly argues that the casino boat is covered by virtue of the Leasehold Deed of Trust, even without the UCC-1s. But First Trust's argument would prove too much. The Leasehold Deed of Trust would necessarily have to be listed on the policy because it is "[t]he instrument[] creating the estate or the interest in real estate which is hereby insured." But it does not follow that the many other security interests created in that same document, which are not interests "in real estate," are also insured. Cf. Havstad v. Fid. Nat'l Title Ins. Co., 68 Cal. Rptr. 2d 487, 489-90 (Cal. Ct. App. 1st Dist. 1997) (holding that a title insurance policy did not insure an easement that did not satisfy the policy's definition of the insured "land," notwithstanding that the policy's scheduled description of the insured property incorporated a subdivision map that showed easements). Given the land-oriented nature of the policy as a whole, including the language of Item 4 on Schedule A, it would be unreasonable to

18

construe the policy as reaching the Leasehold Deed of Trust's security interests in the multitudes of categories of personalty that the document concerns.  Instead, the Leasehold Deed of Trust is insured under the policy only to the extent that it creates a security interest in real estate.

We conclude that the title insurance policy does not insure First Trust's security interest in the Biloxi Belle II.[9] Accordingly, First American Title has no duty to indemnify First Trust for amounts paid in settlement of the White Construction litigation.  Further, because the allegations in that litigation were clearly outside of the policy's coverage, First American Title is not liable for First Trust's defense expenses.  See Moeller v. Am. Guar. & Liab. Ins. Co., 707 So. 2d 1062, 1068-69 (Miss. 1996).  Summary judgment should have been granted in First American Title's favor, not First Trust's.

### III. CONCLUSION

---

[9]     Since we find the language of the policy clear on this point, we need not consider other indicia of the parties' intent. See Pursue Energy Corp. v. Perkins, 558 So. 2d 349, 351-53 (Miss. 1990).  In any event, we note that the evidence is mixed, with each side finding certain facts that support its theory.  We have not overlooked First Trust's assertion that the dollar value of the policy was too high for the policy to insure only the Biloxi parcels and improvements to be built thereon.  First American Title responds that the figure anticipates that the land would appreciate when it became a casino, and that the insured amount is too low if the policy was supposed to cover the improvements to the land, the leasehold interest in the land, and the casino boat.  It would be difficult for us to say which side is correct on this and other points, but the clarity of the policy negates the need to venture a guess.

For the foregoing reasons, the district court's judgment affirming the bankruptcy court's judgment is REVERSED.  The case is REMANDED to the district court for further remand to the bankruptcy court for entry of an appropriate order granting First American Title's request for declaratory relief.