# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

m 99-60431
_____

FIRST TRUST NATIONAL ASSOCIATION,
AS INDENTURE TRUSTEE,

Plaintiff-Appellant,

VERSUS

FIRST NATIONAL BANK OF COMMERCE,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
(1:97-CV-306)
_____

May 31, 2000

Before REAVLEY, SMITH, and
EMILIO M.GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

First Trust National Association ("First
Trust") is indenture trustee for a trust the
assets of which are proceeds of notes sold by
Belle Casinos, Inc. ("BCI"), and Biloxi Casino
Belle, Inc. ("BCBI"). Those assets were
placed by BCI/BCBI into two escrow
accounts to be employed in building two

_____

[*] Pursuant to 5TH CIR. R. 47.5, the court has
determined that this opinion should not be
published and is not precedent except under the
limited circumstances set forth in 5TH CIR. R.

_____

[*](...continued)
47.5.4.

casinos. The casinos ran over budget, and BCI/BCBI filed for bankruptcy. First National Bank of Commerce ("FNBC"), the agent for these escrow funds, failed to obtain necessary documentation, guaranteeing the cost of construction, from various sources, therefore contributing to the cost overruns and the bankruptcy. Before the bankruptcy, First Trust became aware of cost overruns and of its failure to receive from FNBC copies of all necessary documentation.

First Trust sued FNBC, claiming breach of various contractual and fiduciary obligations to the noteholders whom First Trust represents as indenture trustee. FNBC challenged First Trust's suit on grounds of standing and the statute of limitations. The district court found for FNBC on summary judgment on both grounds. First Trust appeals. Agreeing with the district court that limitations bars this action, we affirm.

I.

Mississippi Riverboat Amusements, Ltd. ("MRA"), which owned and operated the Biloxi Belle Casino in Biloxi, Mississippi, decided in 1993 to expand its existing casino (the "Biloxi Project") and to open a new casino in Tunica County (the "Tunica Project"). To facilitate this expansion, MRA established two subsidiary corporations: BCI, a Delaware corporation, and BCBI, a Mississippi corporation. To finance the construction and expansion of the projects, certain notes were sold under an offering put together by Bear, Sterns & Co., Inc., in the name of BCI. The notes were sold to investors (the "noteholders" or "Holders") pursuant to an Indenture under which First Trust served as indenture trustee, thereby agreeing to perform certain acts on behalf of the Holders and in relation to the notes, which

were sold in October 1993.

Upon sale of the notes, FNBC was selected as Disbursing Agent for the proceeds, and its obligations were defined by the Disbursement and Escrow Agreement ("Disbursement Agreement"). The proceeds from the notes were placed into two escrow accounts administered by FNBC, which agreed to distribute the funds from those accounts only on the occurrence of certain conditions listed in the Disbursement Agreement. Simultaneously, BCI loaned the net proceeds of the notes to BCBI, which executed a Disbursement and Escrow Account Security Agreement ("Disbursement Security Agreement") to BCI in the principal amount of $75 million. BCBI was to use the net proceeds of the offering to finance the construction and expansion of the projects and thereafter operate the casinos.

After a draw at closing to pay off the interim loans and closing costs, BCBI deposited almost $60 million into two escrow accounts at FNBC. Finally, an Assignment Agreement was executed between BCI as assignor and First Trust as assignee, whereby BCI assigned all of BCI's rights as Lender to First Trust, including its rights under the Disbursement Agreement. Moreover, BCI assigned its rights, title, and interest in the escrow accounts to First Trust.

According to article III of the Disbursement Agreement, FNBC and First Trust were to receive certain documents (the "initial documents") as a precondition to disbursing money from the escrow accounts. After the note sale, FNBC received Contractor's and Architect's Certificates (the "Disbursement Certificates" or "certificates") as contemplated by article VI of the Disbursement Agreement,

and in particular section 6.08. FNBC, however, was to use the Disbursement Certificates to make disbursements only if both First Trust and FNBC had first secured the initial documents.

Neither First Trust nor FNBC received those documents. FNBC, though, disbursed the requested funds on the strength of the Disbursement Certificates alone.

FNBC first distributed money from the escrow accounts on October 14, 1993, and continued to disburse until May 13, 1994. On or about April 14, 1994, the Holders were first notified by BCI that there were construction-cost overruns. At a meeting between Bear, Stearns and the Holders on May 5, 1994, the Holders received a financial report indicating that the projects had greatly overrun their budgets.

The Holders hired attorneys to negotiate further with BCI and to investigate defaults under the Indenture and Disbursement Agreements. On May 19, 1994, the noteholders' attorney informed Scott Strodthoff, First Trust's vice president, of the overruns and that a review of the Disbursement Agreement indicated that a potential default had occurred, and faxed Strodthoff a copy of the Disbursement Agreement.

On or about May 19, 1994, Strodthoff examined First Trust's file and discovered that only Disbursement Certificates numbered 3, 4, and 5 were in the file. First Trust then hired its own counsel on May 26, 1994, to "review documents regarding construction disbursements." The construction budget in the Disbursement Agreement limited the Biloxi and Tunica Projects to about $30 million each. Accordingly, BCBI could not exceed the budgets by more than $1.2 million without First Trust's permission. There is no evidence that First Trust ever consented to any increase in the budgets.

First Trust declared default on July 12, 1994, and instructed FNBC to transfer the remaining escrowed funds to First Trust; BCI and BCBI filed for bankruptcy on August 31, 1994. First Trust claims that it first discovered FNBC's failure to obtain the initial documents in July 1996, when its attorneys examined FNBC's files.

## II.

First Trust sued in its capacity as indenture trustee on behalf of the Holders on June 10, 1997, claiming breach of the Disbursement Agreement, alleging that FNBC disbursed funds from the escrow accounts without having first received the initial documents. It claimed breach of contract and of fiduciary duty and sought damages in an amount equal to the funds wrongfully disbursed.

In response, FNBC filed a third-party complaint against various third-party defendants, claiming that they were at least partly responsible for FNBC's alleged mishandling of the proceeds. FNBC also filed a motion for summary judgment, arguing that First Trust's action was time-barred and that First Trust lacked standing under the Indenture to bring its claims. The district court found for FNBC on both counts, granting summary judgment and attorney's fees under the Indenture.

## III.

All agree that the applicable statute of limitations is Mississippi's catch-all statute, which requires that

(1) All actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after.

(2) In actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury.

MISS. CODE ANN. § 15-1-49 (1999).

First Trust sued on June 10, 1997. Under subsection (1), therefore, its action is barred if it accrued before June 10, 1994. First Trust claims, however, that the "discovery rule" should apply to toll the statute until July 1996, when it first discovered that FNBC had never sent it the initial documents, or, if the discovery rule does not apply, that its claim was still timely, because its cause of action did not accrue until BCI and BCBI declared bankruptcySSafter June 10, 1994.

The district court and FNBC reason, to the contrary, that First Trust's claim accrued on the day of the first disbursement of funds, that the discovery rule does not apply, and that even if it did, the tolling pursuant to that rule would have ended at the very latest on June 10, 1994, when First Trust's attorneys explained to First Trust that breach had probably occurred and that the relevant documents should be reviewed. We agree.

## A.

In Mississippi, a breach of contract claim accrues at the time of the breach regardless of when damages resulting from the breach oc-

cur. See *Young v. Southern Farm Bureau Life Ins. Co.,* 592 So. 2d 103, 107 (Miss. 1991); *Johnson v. Crisler*, 125 So. 724, 724-25 (Miss. 1930). The breach First Trust complains of is FNBC's disbursement of money without having received and transmitted to First Trust the appropriate documents. Disbursements began on October 14, 1993, and continued until May 13, 1994. First Trust's cause of action therefore emerged at the earliest on the first of those dates and, most generously, on the last.

First Trust claims that its cause of action could not arise until BCI and BCBI filed for bankruptcy, because "First Trust's claims against FNBC were contingent on whether BCI paid the amounts due and owing under the Notes. Only when it became clear that BCI was unable to satisfy its obligations under the Notes was First Trust able to seek recovery of principal and interest from other sources." First Trust argues that the district court's earlier denial of summary judgment to the third-party defendants (regarding the claims brought by FNBC) on limitations grounds should, under the law-of-the-case doctrine, protect First Trust from FNBC's summary judgment motion as well.

First Trust errs in comparing its cause of action to FNBC's. As we will explain, First Trust's viable, independent action against FNBC sounds in contract, while FNBC's action sounds in tortSSrecovery as a result of fraud. The district court's refusal to find the third-party defendants dismissed on limitations grounds is based on when *tort* actions, not contract actions, accrue. As we have said, contract actions accrue when the *breach*, not the *injury*, accrues. While it might have been the case that First Trust's injuries became *final* when BCI/BCBI filed for bankruptcy, formal

4

breach had occurred long before.

Moreover, First Trust errs in its assertion that it enjoyed no option of action before bankruptcy ensued because it could prove no damages. The Disbursement Agreement provides that, "[u]pon the occurrence of any Event of Default, Lender may, in its sole discretion and without notice to or demand on Borrower, and in addition to all rights and remedies available to Lender under the Collateral Documents, demand the return of any funds in the Escrow Account," and take various actions against the borrower. First Trust then, immediately upon disbursement of the first funds, could have recognized that it had not been sent copies of the initial documents, demanded them from FNBC, found that FNBC lacked them as well, declared breach, and seized the escrow accounts.

These actions would have ensured, as concretely as did BCI's and BCBI's bankruptcy, that expenditures from the account would cease until the documentary deficiencies were resolvedSSeither through proper provision of the documentation (thereby protecting the Holders) or through FNBC's discovery of fraud by various third parties and recovery against them (thereby recompensating the Holders). In short, First Trust's claim that its cause of action did not materialize until BCI and BCBI declared bankruptcy cannot stand; it accrued on disbursement of the funds.

## B.

First Trust argues that the analysis above ignores the fact that its claim against FNBC for breach of fiduciary duty is an independent tort that could have emerged at a different, later, time, because tort claims generally arise only when damages therefrom occur.[1] As the district court noted, however, an independent tort does not arise in circumstances in which the tort claim is based solely on a breach of a contractual duty.[2]

---

[1] *See Williams v. Kilgore*, 618 So. 2d 51, 54 (Miss. 1992) (*citing Owens-Illinois, Inc. v. Edwards*, 573 So. 2d 704, 706-07) (Miss. 1990)).

[2] *See Palmer v. Orkin Exterminating Co.*, 871 F. Supp. 912, 914-15 (S.D. Miss. 1994), *aff'd*, 71 F.3d 875 (5th Cir. 1995); *Smith v. Orkin Exterminating Co., Inc.*, 791 F. Supp. 1137, 1143-44 (S.D. Miss. 1990), *aff'd*, 943 F.2d 1314 (5th Cir. 1991) (noting that the "mere failure to perform a contract obligationSSor non-actionSSgives rise to no claim in tort"); *see also Carter Equip. Co. v. John Deere Indus. Equip. Co.*, 681 F.2d 386, 390 (5th Cir. 1982) (opining that "[o]rdinarily, courts do not impose fiduciary duties upon parties to contractual agreements"). In *Palmer*, the court explained that

> [i]t is axiomatic that a single act or course of conduct may constitute not only a breach of contract but an independent tort as well, *if in addition to violating a contract obligation it also violates a duty owed to plaintiff independent of the contract to avoid harming him.* Such independent harm may be found because of the relationship between the parties, or because of defendant's calling or because of the nature of the harm. However, not all breaches of contract are also independent torts: where defendant's negligence *ends merely in nonperformance of the contract and where defendant is not under any recognized duty to act apart from contract*, the courts generally still see no duty to act affirmatively except the duty based onSSand limited bySSdefendant's consent.

*Palmer*, 871 F. Supp. at 914 (citations, quotation
(continued...)

5

First Trust's fiduciary-duty claims against FNBC arise from the same source and the same incidents as do its breach of contract claimsSSthe relationship between the parties created by FNBC's contract and the failure to get and deliver the initial documents to First Trust. No basis independent of the contract exists for finding a fiduciary duty. The district court therefore decided that the fiduciary duty claim was parasitic of the breach on contract claim, and thus accrued as the contract claim accrued.

First Trust does nothing to defeat the district court's reasoning; it merely reasserts that FNBC owed it a contract-based fiduciary duty. Even were it able to convince us that the court erred in finding that First Trust's tort claim is entirely derivative of its contract claim, however, First Trust would gain no ground on the limitations front, because, for reasons we will explain, First Trust was or should have been aware, more than three years before it brought the instant action, that it had been actionably damage.

### C.

We agree with the district court that First Trust's fiduciary duty claim is derivative of its contract claim. Because First Trust insists that a fiduciary relationship existed between it and FNBC, however, and because the bare existence of a fiduciary relationship is, in Mississippi, a question of fact for the jury,[3] we

will analyze First Trust's contention that the discovery rule should apply in this case under the assumption that FNBC was, pursuant to its contractual relationship, a fiduciary of First Trust's.

First Trust argues that the discovery rule should apply in this context because FNBC's errors were latent and undiscoverable, especially because FNBC stood in the position of fiduciary to First Trust, responsible to report all of its errors to First Trust at every opportunity. FNBC responds by noting that the discovery rule has never been applied in Mississippi to a contract claim, and urges us to construe the discovery rule as inapplicable to the contract setting. These facts, however, do not require us to make that determination of Mississippi law.

Even the assumption, *arguendo,* that the discovery rule should apply in a contract setting such as this does First Trust no material good. When applying the discovery rule, "[t]he focus is upon the time that [First Trust] discovers, *or should have discovered by the exercise of reasonable diligence*, that [it] *probably* has an actionable injury."[4] The

---

[2](...continued)
marks and ellipses omitted; emphases added).

[3] *See Carter Equip.*, 681 F.2d at 390. As discussed, we have recognized that any fiduciary duty owed First Trust by FNBC would have arisen as a result of the agreements discussed herein, and
(continued...)

[3](...continued)
thus cannot create an independent tort action. We have not held thereby that FNBC did in fact owe First Trust a fiduciary duty for any purposes, because such a conclusion is reserved to the jury. We conduct the following analysis to demonstrate the irrelevance of such a finding, whatever the answer, to this case.

[4] *Smith v. Sanders,* 485 So. 2d 1051, 1052 (Miss. 1986) (emphases added); *see also In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1031 (N.D. Miss. 1993). The court explained that
(continued...)

would-be plaintiff need not have become absolutely certain that he had a cause of action; he need merely be on notice⸺or *should* be⸺that he should carefully investigate the materials that suggest that a cause probably or potentially exists.[5] Neither need the plaintiff know *with precision* each detail of breach, causation, and damages, but merely enough to make a plain statement of the case backed by evidence sufficient to survive a summary judgment motion.[6]

First Trust argues that FNBC's breaches were inherently undiscoverable, because FNBC "actively concealed its breaches" by "represent[ing] to First Trust, as its fiduciary . . . that it was not aware of any evidence

---

[4](...continued)
The plaintiffs need not have actual knowledge of the facts before the duty of due diligence arises; rather, knowledge of certain facts which are "calculated to excite inquiry" give rise to the duty to inquire. The statute of limitations begins to run once plaintiffs are on inquiry that a *potential* claim exists.

*Id.* (citations omitted; emphasis added).

[5] Mississippi courts have upheld summary judgments on limitations grounds even where the summary judgment record shows that the discovery rule would otherwise have applied under the circumstances, because the plaintiff either knew or should have known that an action had accrued, and it was not therefore latent. *See Robinson v. Singing Riv. Hosp. Sys.,* 732 So. 2d 204, 208 (Miss. 1999); *Womble v. Singing Riv. Hosp.*, 618 So. 2d 1252, 1266 (Miss. 1993); *cf. Chamberlin v. City of Hernando*, 716 So. 2d 596, 601 (Miss. 1998).

[6] *See Robinson*, 732 So. 2d at 208; FED. R. CIV. P. 8, 56.

supporting an Event of Default." First Trust makes a gross overstatement to suggest that FNBC "actively concealed" breach. First Trust provides no evidence of active concealment by FNBC. In fact, the only evidence First Trust supplies in purported support of its position is a letter dated July 13, 1994, in which FNBC explained to First Trust, in relevant part, that

> [a]fter reviewing the documentation, we have reached the conclusion that we cannot comply with your request that we deliver funds directly to you under the Escrow Agreement or the Security Agreement.
>
> Under the terms of the Escrow Agreement, an event of default must exist before we, as escrow agent, can deliver the funds to the trustee. Although we do not have concrete evidence of the existence of an event of default, we would be willing to rely upon your representation to that effect, provided that you indemnified us for any loss we sustained and costs and expenses incurred in connection with the transfer of such funds to you. . . .
>
> In the alternative, under the Security Agreement, you could seize the account. The seizure of the account should be a relatively simple matter. . . . Finally, . . . [w]e can invoke a concursus [interpleader] proceeding and deposit funds into the registry of the court.

This letter hardly indicates active concealment on FNBC's part. Rather, it demonstrates a bank wishing to serve the interests of all relevant parties to the best of its capacity⸺even providing legal advice about

how best a threatening party might achieve its desired ends.

First Trust also argues that the fiduciary relationship between it and FNBC rendered it "entitled to rely" on its conclusion that FNBC had collected and provided to First Trust all of the necessary and appropriate forms, and on FNBC's representation that it lacked concrete proof of an Event of Default. First Trust apparently thought this entitlement survived even in the face of mounting evidence of serious cost overruns, of Holders who had demanded an accounting, of evidence from its own files that FNBC had *actually* defaulted by failing to file with First Trust most of the necessary documentation related to the disbursements, and of lawyers who told it that a default had probably occurred and that it should begin a review of its records to document and act on that default.

While fiduciary relationships *do* often obscure misfeasance on the fiduciary's part and thus trigger the discovery rule, the principal of a fiduciary is not thereby permitted permanently and willfully to ignore patent evidence of the fiduciary's breach so as to delay indefinitely the accrual of an action against the fiduciary.[7] Statutes of limitations exist to protect the courts from indolent claimants as well as defendants from stale claims.

In defense of its position, First Trust points to *Merchants & Marine Bank v. Douglas-Guardian Warehouse Corp.*, 801 F.2d 742 (5th Cir. 1986). There, a bank hired Douglas-Guardian to keep track of the inventory of a debtor. Because of the debtor's misfeasance, Douglas-Guardian submitted incorrect reports to Merchants & Marine Bank, badly overstating the value of the debtor's inventory. Douglas-Guardian did, however, provide all reports to the bank as scheduled, and left the bank with no way of discerning the incorrectness of the reports. *See id.* at 744-45. The court held that, under those circumstances, the bank's action against Douglas-Guardian for contract breach did not accrue until the bank discovered the error in the reports.[8]

*Merchants & Marine*'s facts are inapposite here. As the Disbursement Agreement signifies, "[a]gent's obligation to disburse any portion of the funds in the Escrow Account to Borrower . . . is subject to *Agent and Trustee* having received the . . . Collateral Documents." (Emphasis added). First Trust, by its own admission, never received these documents. This failure to receive documentsSSeven without notice of cost over-

_____

[7] For its proposition, First Trust relies on *Smith v. Sneed*, 638 So. 2d 1252, 1258 (Miss. 1994), holding that the discovery rule would work against a lawyer in a malpractice suit in part because of "the inability of the layman to detect [legal] misapplication; the client may not recognize the negligence of the professional when he sees it." *Id.* (citations omitted). Here, of course, First Trust does not merit "lay" status; it is, after all, a trust company, and therefore must be charged with the duty of knowing how to read a trust indenture, being aware of the rights and duties therein, and (continued...)

[7](...continued)
being able to protect those rights and duties.

[8] *See also Smith*, 638 So. 2d at 1257 (holding that the statute will not run against a fiduciary "until the client discovers, or should discover, the material facts in issue" because such tolling "vindicates the fiduciary duty of full disclosure") (citation omitted).

runsSSconstituted the relevant "event of default."

It was always within First Trust's power, upon knowledge that disbursements were being made, simply to review its records, note the lack of documentation, demand the documents, and order that FNBC cease disbursements and return the remaining escrow money to First Trust upon failure to comply with the demand. Unlike Merchants & Marine Bank, First Trust did not regularly, and in conformance with its contract, receive documents that were false. Instead, it failed to receive documents that it knew, or should have known, it should have been receiving. First Trust, therefore, did not suffer a latent or hidden breach; the breach was always, or should always have been, patently obvious to a reasonably diligent party.[9]

The district court chronicled the events that occurred before June 10, 1994:

---

[9] First Trust again points the panel to *Smith*, 638 So. 2d at 1257, wherein the court instructed that

> the general policies underlying th[e] statute of limitations will not be thwarted by adoption of the discovery rule *in that limited class of . . . cases in which, because of the secretive or inherently undiscoverable nature of the [act] the plaintiff did not know, or with reasonable diligence could not have discovered, that he had been [injured].* In such rare instances, we do not believe that a plaintiff can be accused of sleeping on his rights.

*Id.* (citations omitted; emphasis added). Again, this is inapposite, because even minimal diligence by First Trust would have brought discovery of the agent's breaches.

The record indicates that First Trust was first informed of the cost overruns on April 29, 1994. After taking over the account [a First Trust executive] was notified of the cost overruns on May 16, 1994, when he received a call from a Holder. As previously stated, [another party] also called [him] on May 19, 1994 and discussed the Holders' concerns about potential defaults under the Disbursement Agreement and the Indenture. [He] reviewed the Disbursement Agreement on or about May 19, 1994, and discovered that Disbursement Certificates numbers 3, 4, and 5 were the only documentation in First Trust's file. . . . First Trust hired its own counsel on May 26, 1994, to review all documents pertaining to the construction of the projects. First Trust also sent letters to FNBC on May 26 and June 3, 1994, acknowledging that disbursements had been made by FNBC and requesting Disbursement Certificates that it had not received as required by section 6.08 of the Disbursement Agreement.

None of these facts comports with the picture of an entity's remaining blissfully unaware that a cause of action had "probably" or "potentially" arisen. Rather, they are events indicating that First Trust not only should have recognized but actually recognized that its rights had been jeopardized, and that it needed to take forceful and perhaps litigious action to defend them.

What follows these actions, though, is a long pauseSSuntil June 1996 according to First TrustSSin which First Trust took no action

against FNBC.[10] The district court was fully justified in concluding that First Trust knew or should have known that breach probably had occurred before June 10, 1994. Applying the discovery rule, then, cannot save First Trust's cause of action.

## IV.

The question of attorney's fees is parasitic here. Section 10.14 of the Disbursement Agreement reads, "[i]f any action or proceeding is brought by any party against any other party under this Agreement, the prevailing party shall be entitled to recover such costs and attorneys' fees as the court in such action or proceeding may adjudge reasonable." Because we affirm the judgment rendering FNBC the prevailing party, we affirm too on the issue of attorney's fees. Neither side challenges the amount of fees awarded.

AFFIRMED.

---

[10] First Trust claims in July 1996 to have learned for the first time that FNBC had not received any initial documents (even though it knew or should have known that *it* had also never received such documents, as required), and realized that FNBC was a relevant target of litigation. Even then, First Trust still waited another 11 months, until June 1997, to sue FNBC.