# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00073-COA

**GLORIA BAKER, CONNIE CORNWALL,**           **APPELLANTS**
**CAROLYN GREER, DANIEL MORRIS, AND**
**JUDY TRAVIS**

**v.**

**RAYMOND JAMES & ASSOCIATES INC.,**           **APPELLEES**
**LOGAN B. PHILLIPS JR., AND STEVEN KANE**
**SAVELL**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/06/2018 |
| TRIAL JUDGE: | HON. JEFF WEILL SR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANTS: | FRANK CHANDLER BREESE III |
| ATTORNEYS FOR APPELLEES: | JEFFREY R. BLACKWOOD |
| | ALAN W. PERRY |
| | STEVIE FARRAR RUSHING |
| | STEFANIE M. WAYCO |
| | TERRY R. WEISS |
| | JAMES WILBOURN VISE |
| | ROBERT T. HIGGINBOTHAM JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 04/07/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Gloria Baker, Connie Cornwall, Carolyn Greer, Daniel Morris, and Judy Travis

(plaintiffs) sued certain defendants for claims relating to their financial advisor's alleged

malfeasance.  The plaintiffs appeal after the Hinds County Circuit Court dismissed their

claims as time-barred. Finding error with respect to the plaintiffs' common-law claims, we reverse and remand so that the plaintiffs may proceed in the circuit court on these claims. We affirm the circuit court's grant of summary judgment in these certain defendants' favor on the plaintiffs' claims under the Mississippi Securities Act of 2010, Mississippi Code Annotated sections 75-71-501 and 75-71-502 (Rev. 2016).

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.    On October 19, 2017, Baker, Cornwall, Greer, Morris, Travis, and a sixth person named Janice Stricklin sued Raymond James & Associates Inc., a brokerage firm; Regions Financial Corporation (Regions), the former owner of Morgan Keegan (acquired by Raymond James); Logan B. Phillips Jr., a branch manager of Raymond James and Morgan Keegan; and Steven Kane Savell, the plaintiffs' financial advisor who worked with Morgan Keegan and Raymond James.[1] The plaintiffs alleged that Savell engaged in financial-advisor malfeasance in handling their retirement investment accounts to enrich himself and his employer; that Raymond James[2] was liable pursuant to the doctrine of respondeat superior; and that Raymond James and its manager, Phillips, failed to properly supervise Savell in his management of the plaintiffs' accounts. The plaintiffs alleged they were damaged by these actions because they suffered substantial losses in their retirement investment accounts.

---

[1] Stricklin's claims against the defendants were subsequently dismissed with prejudice, and the remaining plaintiffs dismissed their claims against Regions in an agreed order approved and entered by the circuit court on July 3, 2018.

[2] Savell worked for Morgan Keegan from 2004 until it was acquired by Raymond James. The plaintiffs allege in their complaint that Raymond James "acquired Morgan Keegan . . . and acquired its liabilities[,] including liability for claims that are the subject of [their] complaint."

2

Specifically, the plaintiffs alleged common-law claims, including false representation, negligent representation, negligence, fraud, and breach of contract. The plaintiffs also alleged violations of the Mississippi Securities Act of 2010, *supra*.

¶3. After deposing each of the plaintiffs, Raymond James and Phillips moved for summary judgment, asserting that the plaintiffs' claims were time-barred under the applicable statutes of limitations. Savell, the other remaining defendant, later joined in their summary judgment motion. The defendants attached to their summary judgment motion the monthly and year-end account statements and trade confirmations furnished to the plaintiffs relating to their investment accounts, as well as excerpts from the plaintiffs' depositions in which the plaintiffs acknowledged, among other things, that they had received this information.

¶4. In opposition to the defendants' motion for summary judgment, the plaintiffs submitted a response, along with affidavits from each plaintiff, among other exhibits. In their affidavits, the plaintiffs state that they are retirees from blue-collar or clerical jobs with BellSouth[3] and had no formal education beyond high school. Between 2002 and 2005, the plaintiffs rolled over either all or a sizable portion of their retirement assets to Savell. Savell was their financial advisor until he left Raymond James in 2013.

¶5. According to the plaintiffs, they did not have any investment experience before they opened their investment accounts through Savell, other than their BellSouth pension and 401k plans, with which they had had minimal involvement. The plaintiffs also stated in their

---

[3] The plaintiffs began their careers with the phone company when it was South Central Bell. It then became BellSouth, and it later became AT&T. The phone company will be referred to as BellSouth.

affidavits that in encouraging them to invest with him, Savell told them that if they would invest their money with him "he would invest [their] money in a way that would provide [them] with income for the remainder of [their] life and that [their] principal would grow over time." The record reflects that the plaintiffs continued to receive monthly "retirement checks" from their investment accounts during the relevant time period.

¶6. Between 2003 and, at the latest, 2013, Savell purchased various variable annuities for the plaintiffs. According to the plaintiffs, Savell liquidated these investments "in the short-term," when they were "designed to be held long-term," causing the plaintiffs to incur surrender charges and other losses. Savell also purchased penny stocks of small companies in the oil business (Canwest and Ridgeway penny stocks) during this time period. These purchases, according to the plaintiffs, were "high-risk [and] unsuitable" and also "violated Morgan Keegan's own policy against purchasing stocks selling for less than [five dollars per share]." The plaintiffs also experienced significant losses on these penny stock investments. The plaintiffs also assert that Savell was engaging in "'reverse churning,' a term used in the brokerage industry to denote an account being charged a fixed fee although there is little or no trading in that account."

¶7. The plaintiffs received monthly and year-end account statements that reflected the change in value of the investor's assets from the beginning to the end of the reporting period. The plaintiffs also received all trade confirmations. Savell left Raymond James in 2013. The plaintiffs had stopped using Savell by that time. The plaintiffs concede that "[a]ll acts of [Savell's] alleged malfeasance [relating to the plaintiffs'] account[s] took place more than

4

three years before they filed suit" in October 2017.

¶8.     In their affidavits, the plaintiffs state that during the years Savell handled their accounts, they noticed their accounts had sustained sizeable losses, and they would speak with Savell about these losses. Savell "always assured [them] that everything was fine, and that [they] would fully recover. He told [them] things like 'stay the course,' 'hang in there,' 'we're still okay' and other such assurances."

¶9.     The plaintiffs also state in their affidavits that in 2016 they learned from former co-workers, who had also been customers of Savell, that they had filed an arbitration claim against Raymond James because of alleged mishandling of their accounts by Savell.[4] Shortly after receiving the information that Savell may have mishandled their accounts, each plaintiff contacted an attorney to determine whether they may have any potential claims against Savell. Before that time, according to the plaintiffs, they believed their losses were because they just had bad luck in the stock market. As noted, their lawsuit was filed in October 2017.

---

[4] The record contains a 2017 decision in a Financial Industry Regulatory Authority arbitration case that was brought against Raymond James and Logan Phillips in 2014 on behalf of twenty-six people, many of whom were BellSouth retirees, involving acts similar to the types of acts described in the plaintiffs' lawsuit in this case. In its 2017 decision, the arbitration panel found as follows:

> The Panel finds that the financial advisor [Savell] acted in reckless disregard of the interests of the [claimants] by failing to exercise reasonable care in handling of their investments, recommending the purchase of penny stocks, which were highly speculative, risky, and unsuitable for their financial circumstances, failing to provide [the claimants] with risk and suitability information concerning the penny stock transactions, soliciting the purchase of penny stock in violation of SEC regulations and Morgan Keegan & Company, LLC's internal policies and procedures, and by misrepresenting material facts by "mismarking" the confirmations of the penny stock purchase as "unsolicited."

¶10. The circuit court ruled on the defendants' summary judgment motion without a hearing. Finding that all the plaintiffs' claims were time-barred, the circuit court granted summary judgment in the defendants' favor and dismissed the plaintiffs' claims with prejudice. The final judgment of dismissal was entered on December 6, 2018. The plaintiffs appealed.

## STANDARD OF REVIEW

¶11. In *Weathers v. Metropolitan Life Insurance Co.*, 14 So. 3d 688, 691 (¶12) (Miss. 2009), the Mississippi Supreme Court set forth the standard of review applicable in this case:

> This Court applies a de novo standard of review to the statute of limitations. Furthermore, this Court reviews grants of summary judgment under the de novo standard." Pursuant to Rule 56 of the Mississippi Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c).

(Citations and internal quotation marks omitted). Additionally, "[t]he court views the evidence in the light most favorable to the nonmoving party[,]" and "[t]he moving party bears the burden of demonstrating there is no genuine issue of material fact." *Id.* Finally, "where there is doubt whether a fact issue exists, the non-moving party is the beneficiary of that doubt." *Id.*

¶12. "[A]s the [parties] asserting that [their] case is not barred by the statute of limitations, [the plaintiffs bear] the burden of proving that the limitations period should be tolled." *Commercial Bank v. Smith Shellnut Wilson LLC*, 270 So. 3d 136, 146 (¶26) (Miss. Ct. App. 2018).

6

## DISCUSSION

### I. Time-Bar with Respect to Plaintiffs' Common-Law Claims

¶13. The circuit court found that the plaintiffs' complaint was filed outside the applicable limitations period and that they failed to meet their burden to prove a genuine issue of material fact regarding any basis for tolling the statute-of-limitations period with respect to their common-law claims. The plaintiffs assert that the statute-of-limitations period on their claims was tolled until 2016 because it was not until then that they learned of Savell's potential wrongdoing—i.e., that their losses may constitute an "actionable injury." *First Trust Nat. Ass'n v. First Nat. Bank of Commerce*, 220 F.3d 331, 336 (5th Cir. 2000). For the reasons addressed below, we find that the circuit court was in error. We therefore reverse and remand on this issue so that the plaintiffs may proceed with their common-law claims against the defendants.

¶14. Mississippi Code Annotated section 15-1-49 (Rev. 2019), Mississippi's catch-all three-year statute of limitations, applies to all of the plaintiffs' common-law claims: false representation, negligent representation, negligence, fraud, and breach of contract. *See Peoples Bank of Biloxi v. McAdams*, 171 So. 3d 505, 508 (¶11) (Miss. 2015) (negligence); *CitiFinancial Mortgage Co. v. Washington*, 967 So. 2d 16, 19 (¶7) (Miss. 2007) (fraudulent misrepresentation and breach of contract); *Sanderson Farms Inc. (Prod. Div.) v. Ballard*, 917 So. 2d 783, 789 (¶29) (Miss. 2005) (fraud); *Andrus v. Ellis*, 887 So. 2d 175, 176 (¶4); 179 (¶22) (Miss. 2004) (fraudulent and negligent misrepresentation). The parties do not dispute this application.

¶15. Section 15-1-49(1) provides that the limitations period begins within three years "after

7

the cause of action accrued . . . ." In *Weathers*, 14 So. 3d at 692 (¶14), the supreme court observed that "a cause of action accrues when it comes into existence as an enforceable claim, that is, when the right to sue becomes vested." *Id.* (emphasis, citations, and internal quotation marks omitted).

¶16.    Section 15-1-49(2) sets forth a latent-injury discovery-rule exception to the three-year limitations period, as follows: "In actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury." Miss. Code Ann. § 15-1-49(2).   "Under Section 15-1-49(2), "[t]he statute of limitations begins to run once plaintiffs are on inquiry that a potential claim exists." *Commercial Bank*, 270 So. 3d at 147 (¶32).  Stated another way, the operative time is when the plaintiffs "discover[], or should have discovered by the exercise of reasonable diligence, that [they] probably [have] an actionable injury.'" *First Trust*, 220 F.3d at 336 (emphases omitted) (quoting *Smith v. Sanders*, 485 So. 2d 1051, 1052 (Miss. 1986)).[5]  As the supreme court has recognized, "discovery is an issue of fact to be decided by a jury when there is a genuine dispute." *Weathers*, 14 So. 3d at 692 (¶14) (citing *Donald v. Amoco Prod. Co.*, 735 So. 2d 161, 167 (¶16) (Miss. 1999)).  The supreme court in *Weathers* succinctly summarized the test as follows: "Therefore, the critical question with which we are confronted is whether, in a summary judgment context, we can identify as a matter of law, the point at which [the

---

[5] The supreme court held in *Sanders* that "[t]he operative time is when the patient can reasonably be held to have knowledge of the injury itself, the cause of the injury, and the causative relationship between the injury and the conduct of the medical practitioner." *Sanders*, 485 So. 2d at 1052.

plaintiff] knew or should have known or should have made an inquiry, based on the information available to him." *Id.* We now address the defendants' assertions and the circuit court's determinations on this issue.

¶17. The defendants assert that the circuit court's decision should be affirmed because the plaintiffs' injuries were not "latent," and therefore the discovery rule should not apply. According to the defendants, the account statements each plaintiff received demonstrated such significant losses that the plaintiffs possessed sufficient information to put them on "inquiry notice" to conduct "reasonable diligence" into discovering the potential causes of the losses they suffered. The defendants make this assertion despite the assurances Savell gave to the plaintiffs that their accounts "would fully recover" and that they should "stay the course."

¶18. We do not find merit in the defendants' assertions. We recognize that the plaintiffs concede that their account statements showed substantial losses. We do not find, however, that the losses reflected in the plaintiffs' account statements, standing alone, were sufficient as a matter of law to put the plaintiffs on notice that they may have had an "actionable injury"[6] or a "potential claim"[7] against Savell at that time.

¶19. The plaintiffs' affidavits reflect that when they saw that their accounts had sustained sizeable losses, they asked Savell about these losses. We find this is evidence that the

---

[6] *First Trust*, 220 F.3d at 336.

[7] *Commercial Bank*, 270 So. 3d at 147 (¶32).

9

plaintiffs exercised reasonable diligence in seeking information about their losses.[8] When the plaintiffs inquired about their losses, Savell would say "that everything was fine, and that [their accounts] would fully recover," and give similar assurances. Like the supreme court in *Weathers*, we do not find, as a matter of law, that Savell's assurances contradicted the plain language of the plaintiffs' account statements so as to require the plaintiffs to conduct further investigation regarding any potential claims against Savell at that point. *See Weathers*, 14 So. 3d at 694 (¶21). A discussion of the *Weathers* decision is warranted here.

¶20. In *Weathers*, 14 So. 3d at 689 (¶2), the insured (Weathers) sued MetLife for misrepresentation and other similar claims based on representations made by his agent that his premium obligation would "vanish" after ten years because the policy would then become self-sustaining through dividends after that time. Like the plaintiffs in this case, who sued the defendants after learning about their co-workers' arbitration action against Savell based on his alleged mishandling of their funds, Weathers brought his lawsuit after he received notice about a class-action lawsuit against MetLife concerning the "vanishing" premium feature in his policy. *Id.* at 690-91 (¶¶7-8). MetLife moved for summary judgment, asserting that Weathers' claims were time-barred because certain provisions in Weathers's policy should have put Weathers on notice of his agent's misrepresentations at the time Weathers purchased the policy. *Id.* at 692 (¶16).

¶21. In response, Weathers asserted that his lawsuit was timely. *Id.* at 692, 694 (¶¶15, 20).

---

[8] *See Bennett v. Hill-Boren P.C.*, 52 So. 3d 364, 371-72 (¶23) (Miss. 2011) (recognizing that plaintiffs had "submitted evidence in their legal malpractice case showing that they had exercised reasonable diligence by continually inquiring into how [their] case was progressing through their telephone calls and written correspondence to [their lawyer]").

10

Reading his policy would not have alerted him to any potential claim against MetLife, Weathers argued, because the policy provisions were consistent with the agent's representations, and thus the limitations period was tolled until he received the class action notice. *Id.* The supreme court agreed that summary judgment in MetLife's favor was not appropriate, finding that "a genuine issue of material fact exists as to whether [the agent's] representations conflicted with the plain language of the policy, so as to place Weathers on notice of any alleged misrepresentation or fraud at the time the policy was issued." *Id.* at 694 (¶21).

¶22.    We find that the supreme court's analysis in *Weathers* is helpful in this case. The plaintiffs' affidavits reflect that when they moved their retirement funds to allow Savell to invest for them, he assured them that "he would invest [their] money in a way that would provide [them] with income for the remainder of [their lives] and that [their] principal would grow over time." As the record also reflects, the plaintiffs did not hold degrees beyond high school, they were not experienced investors, and they relied on Savell to give them information and answer their questions about their investments, including their questions about the losses they had incurred.

¶23.    When asked about the losses, Savell told the plaintiffs that they should "stay the course" and that their accounts would "fully recover." In short, Savell's subsequent assurances in response to the plaintiffs' questions about their losses—like his initial assurances promising the plaintiffs growth "over time" and income for life—related to the *long-term performance* of the plaintiffs' retirement investment accounts and did not, as a matter of law, conflict with the plaintiffs' objectives or the immediate losses reflected on

11

their statements. Indeed, the plaintiffs were still receiving the "retirement checks" that Savell promised.

¶24. Under these circumstances, and in the light of the complexities involved in Savell's handling of the plaintiffs' accounts, we find that there exists a genuine issue of material fact whether Savell's subsequent assurances conflicted with the immediate losses shown on the account statements so as to put the plaintiffs on inquiry notice to further investigate any potential claims against Savell. *Id.*

¶25. The defendants cite *Commercial Bank*, *supra*, and *Speed v. AmSouth Bankcorporation*, No. 3:04-cv-909-LN, 2006 WL 839546 (S.D. Miss. Mar. 30, 2006), among other cases addressed below, in support of their assertion that the plaintiffs' duty to investigate potential claims did not end after Savell's assurances in response to their questions about their losses. These cases are distinguishable and do not change our analysis here.

¶26. In *Commercial Bank*, 270 So. 3d at 140 (¶¶1-2), the Bank in 2005 and 2007 purchased $1,850,000 in securities at the recommendation of its investment advisor and then discovered in 2014 that it was ineligible to purchase those securities. The Bank sued the investment advisor in 2016 for failing to disclose the purchasing-and-holding eligibility requirements for the securities. *Id.* at (¶2). The record reflected, however, that the Bank had received copies of the securities' offering circulars on at least six different occasions between 2007 and 2011, some of which contained notice of the purchaser-eligibility requirements. *Id.* at 146 (¶28). In affirming the circuit court's granting of summary judgment based on limitations grounds, this Court found that the offering circulars were sufficient "to put the

12

Bank on inquiry notice that 'it should carefully investigate the materials that suggest that a cause probably or potentially exists.'" *Id.* at 149 (¶36) (quoting *First Trust*, 220 F.3d at 336-37).

¶27. We find that *Commercial Bank* is distinguishable from the circumstances in this case, which are more like the facts in *Weathers*. In *Commercial Bank*, 270 So. 3d at 150 (¶40), "the premise of the Bank's lawsuit [was] that it was not a [qualified institutional buyer (QIB)] or a qualified purchaser, which [was] in *direct contrast* to the sales restrictions in the federally-required notice in the offering circulars as to entities that were not QIBs or qualified purchasers." (Emphasis added). As we have addressed above, in this case, like the *Weathers* case, we find that there exists at least a question of fact whether Savell's assurances conflicted with the losses reflected on the plaintiffs' account statements.

¶28. In finding that the plaintiffs' common-law claims were time-barred, the circuit court also relied on this Court's observation in *Commercial Bank* that "an investor's . . . blind reliance upon an investment advisor's advice should not relieve the investor of his common sense obligation to review investment materials which are . . . provided to him." *Commercial Bank*, 270 So. 3d at 150-51 (¶42). We do not find that this point applies here.

¶29. First, as discussed, we find that a question of fact exists in this case whether Savell's assurances conflicted with the immediate losses reflected in the plaintiffs' account statements. Second, in *Commercial Bank*, this Court distinguished the Bank from the lay plaintiff in *Weathers*, as follows: "unlike Mr. Weathers, with respect to the Bank's ability to assess the need to investigate the notice in the offering circulars, the record shows no evidence that would entitle the Bank to 'lay' status." *Id.* at 150 (¶41). In this case, the

13

plaintiffs, like Mr. Weathers, *are* entitled to "lay" status and to the accompanying application of the discovery rule in that context, as we discuss below. *See, e.g.*, *Smith v. Sneed*, 638 So. 2d 1252, 1258 (Miss. 1994) (applying the discovery rule in a legal malpractice lawsuit in part because of "the inability of the layman to detect [legal] misapplication; the client may not recognize the negligence of the professional when he sees it").

¶30.    *Speed v. AmSouth Bankcorporation*, No. 3:04-cv-909-LN, 2006 WL 839546 (S.D. Miss. Mar. 30, 2006), is also distinguishable.  In *Speed*, two plaintiffs, the Woods, sued their investment advisor for allegedly inducing them to purchase "unsuitable securities[9] based on his misrepresentation that the investments were safe and suitable for their needs." *Id.* at *1. Year-end account statements provided to the Woods indicated that the two variable annuities at issue had lost nearly ten percent of their principal value. *Id.* at *5.

¶31.    The federal district court granted summary judgment to the defendants, finding that the plaintiffs' claims were time-barred in the light of the fact that they "did nothing" after receiving statements showing their significant losses.  As the district court explained:

> It is clear . . . that [the Woods] knew, by no later than January 2001, that their investments could and did suffer significant losses or principal, and yet while they were "upset" and "shock[ed]" that this had occurred, *they still did not complain to AmSouth that they had been misled, they did not contact (or attempt to contact)* [*their financial advisor*] *for an explanation or to complain of their losses; they did not ask questions of anyone as to why they were losing their principal. In short, they did nothing*.

*Id.* (emphasis added).[10]

---

[9] The subject investments in *Speed* consisted of "two variable annuities." *Id.* at *2.

[10] The federal district court further observed:

¶32. Unlike the Woods, who "did nothing" in the face of significant losses shown on their account statements, the plaintiffs in the instant case *did* question Savell about their losses at various times, and each time he assured him that they were "fine" for the long-term and that their accounts would recover.[11] Moreover, the investments at issue in *Speed* appeared to involve just two variable annuities and the statements the Woods received reflected losses

---

> Here, plaintiffs have admitted that when they learned, first in April 2000 and then in January 2001, that they had sustained losses to their principal value, they chose to do nothing. Mrs. Woods testified, for example, that when they received the April 2000 statement, they "felt like something had gone wrong maybe," but they "were still willing to depend on [their advisor's] integrity and of the bank, that we felt like it would be straightened out." Yet they did not ask anyone to straighten it out. When they subsequently received the year-end statements in January 2001, they obviously knew that nothing had been "straightened out," and that more of their principal had been lost. Yet still they did nothing.

*Id.* at *7.

[11] The defendants in the instant case also cite *Peoples Bank of Biloxi*, 171 So. 3d at 509-10 (¶¶17-22), to support their contention that the plaintiffs were put on inquiry notice, as a matter of law, when they received their account statements showing significant losses. In *Peoples Bank*, the bank offered evidence that it sent bank statements to the chancery clerk at the close of each month showing significant disbursements from a guardianship account held by the Harrison County Chancery Clerk. *Id.* at 510 (¶19). The chancery clerk asserted he never received the statements, and he waited nearly two years before requesting the statements that showed abnormalities in the account. *Id.* at 509-10 (¶¶17-19). The supreme court recognized that a reasonable person would have requested the missing bank statements and held that the chancery clerk's negligence claim against the bank for paying on a forged check from the account accrued on the date when the chancery clerk, had he exercised reasonable diligence, could have requested missing bank statements that would have revealed the bank's negligence. *Id.* at 510 (¶¶20-21).

In the instant case, the plaintiffs, unlike the chancery clerk in *Peoples Bank*, asked Savell about their losses at various times, and each time Savell assuaged their concerns by assuring them that their losses would be recouped. *Peoples Bank* is wholly distinguishable from the facts in this case and not applicable here.

attributable to just these annuities.  *Id.* at *4-5.  The instant case, in contrast, involves complex financial maneuverings Savell allegedly undertook with the plaintiffs' funds.  As we discuss in detail below, this factor, coupled with numerous other factors, creates a question of fact whether Savell's wrongdoing was "inherently undiscoverable" so as to toll the limitations period until 2016 when the plaintiffs learned Savell may have violated the law and industry rules.  We find that these circumstances distinguish *Speed* from this case.

¶33.    The defendants also assert that the plaintiffs' contention that they did not learn of the alleged wrongdoing until 2016 is irrelevant because the latent-injury discovery rule does not consider when a plaintiff actually learned of a potential cause of action—but rather concerns when a plaintiff "should have discovered by the exercise of reasonable diligence, that [it] probably has an actionable injury."  *First Trust*, 220 F.3d at 336.  According to the defendants, had the plaintiffs exercised "reasonable diligence" upon seeing their significant losses, they would have discovered that they had an "actionable injury" prior to 2016.  Related to this point, the defendants assert that because Savell left Raymond James in 2013 and he was no longer the plaintiffs' advisor, Savell's assurances could not, in any event, serve to toll the statute-of-limitations period after that time.

¶34.    We do not find merit in defendants' assertions. Mississippi jurisprudence establishes that "the discovery exception [may be applied] where the plaintiff will be precluded from discovering harm or injury because of the secretive or *inherently undiscoverable nature of the wrongdoing* in question . . . [o]r . . . *when it is unrealistic to expect a layman to perceive the injury at the time of the wrongful act*."  *Donald*, 735 So. 2d at 168 (¶18) (citation omitted) (emphasis added).  In this case, we find that the plaintiffs' losses arose from the "inherently

16

undiscoverable nature of [Savell's] wrongdoing," *id.*, *and* that it is unrealistic for the plaintiffs, as laymen, to have perceived their injury at the time of Savell's financial-advisor malfeasance.

¶35. In addressing the first test, the "inherently undiscoverable" test, we begin by observing that "[b]ecause there is no bright line rule [in defining a latent injury], the specific facts of the case will determine whether the plaintiff knew or reasonabl[y] should have known that an injury existed." *PPG Architectural Finishes Inc. v. Lowery*, 909 So. 2d 47, 51 (¶14) (Miss. 2005). In reviewing the evidence in the light most favorable to the plaintiffs in the instant case, we find that the defendants did not prove as a matter of law that the plaintiffs' common-law claims were barred by section 15-1-49(1).

¶36. The record reflects that Savell allegedly engaged in complex investment activities involving the plaintiffs' accounts, including repeatedly purchasing and then liquidating annuities for the short-term, though these instruments were designed to be held for the long-term;[12] purchasing penny stocks and then marking them as "unsolicited" allegedly so as to prevent detection by the brokerage firm's policy against solicited purchases of such stock; and allegedly engaging in "reverse churning," which, as noted above, involves denoting an

---

[12] The defendants assert the record shows the plaintiffs acknowledged, at the time the annuities were purchased, that they agreed to charges associated with the annuities. We do not find, however, that because the plaintiffs acknowledged and agreed to these charges that this is evidence that the plaintiffs knew, or had reason to know at that time, the *effect of Savell's conduct* in selling annuities in the short-term when they were meant to be held for the long-term.

account as being charged a fixed fee regardless of whether there is any trading.[13]

¶37. The plaintiffs, on the other hand, had no more than high school educations and were financially inexperienced. In the light of (i) the complicated nature of Savell's investment activities and the sophisticated financial instruments at issue here; (ii) the plaintiffs' financial inexperience; (iii) the fact that the plaintiffs continued to receive their monthly "retirement checks;" and (iv) Savell's repeated reassurances when the plaintiffs questioned him about the decline in their investments, we find that Savell's wrongdoing was "inherently undiscoverable" and that there exists a genuine issue of material fact whether the plaintiffs knew, or should have known in the exercise of reasonable diligence, that they had an "actionable injury" before 2016 when the plaintiffs assert that they first learned "Savell and Morgan Keegan might have violated the law and industry rules."

¶38. With respect to the second test, i.e., the layman test, in the analogous legal-malpractice context, the supreme court has recognized that it is unrealistic to expect a layman client to detect injury resulting from a purported expert's conduct, as follows: "[t]he corollary to an attorney's expertise is the inability of the layman to detect its misapplication; the client may not recognize the negligence of the professional when he sees it." *Bennett*, 52 So. 3d at 372 (¶24) (internal quotation mark omitted). The discovery rule applied in this context is that "the statute of limitations begins to run on the date that the plaintiff learns, or through

---

[13] The defendants argue the record shows that in 2007 and 2011 the plaintiffs that made this claim signed contracts agreeing to pay fixed fees, instead of commissions for transactions, and that the fee appeared on their account statements. We do not find, however, that this information is evidence that these plaintiffs knew, or had reason to know at that time, that this could possibly result in "reverse churning" on Savell's part.

reasonable diligence, should have learned, of the negligence of the lawyer." *Id.* at 369 (¶15); *see also Sneed*, 638 So. 2d at 1253.

¶39.    We find that the circumstances of this case warrant that this common-sense rule be applied here.[14] For the same reasons listed above concerning the "inherently undiscoverable" test, we find that given plaintiffs' lay status there exists a genuine issue of material fact when the plaintiffs learned, or through reasonable diligence should have learned, of the defendants' alleged malfeasance.

¶40.    Based upon the foregoing, we find that the circuit court erred in awarding summary judgment in the defendants' favor based upon statute-of-limitations grounds with respect to the plaintiffs' common-law claims.

## II.     Blue-Sky-Law Claims Waived

¶41.    The circuit court also held that the plaintiffs' claims under the Mississippi Securities Act of 2010, *supra*, were time-barred. The plaintiffs did not challenge this ruling on appeal. It is, therefore, waived. *Rosenfelt v. Miss. Dev. Auth.*, 262 So. 3d 511, 519 (¶27) (Miss. 2018) ("The appellant must affirmatively demonstrate error in the court below, and failure to do so waives an issue on appeal."). We therefore affirm the circuit court's order granting

---

[14] We recognize the defendants assert that the district court in *Bolden v. Kentucky Financial Co.*, 316 F. Supp. 2d 406, 411 (S.D. Miss. 2004), rejected the plaintiffs' argument in that case that their lack of sophistication precluded them from discovering their purported claims relating to the terms of their loan documents concerning credit insurance. In *Bolden*, however, the court found "that the loan documents *are clear and plainly impart to the reader the information that plaintiffs claim was misrepresented and/or not disclosed to them*. Plaintiffs, though perhaps unsophisticated, are nevertheless held by law to have knowledge of the content of their contracts." *Id.* (emphasis added). These circumstances are not present in the instant case, nor does *Bolden* involve an financial advisor's alleged malfeasance in connection with investors' accounts. *Bolden* is not analogous here.

19

summary judgment in the defendants' favor on this issue.

¶42.    For the reasons addressed above, we affirm the circuit court's order granting summary judgment in the defendants' favor on the plaintiffs' claims under the Mississippi Securities Act of 2010, *supra*.  We reverse the circuit court's order granting summary judgment in the defendants' favor on the plaintiffs' common-law claims of false representation, negligent representation, negligence, fraud, and breach of contract, and we remand this case for further proceedings on these claims.

¶43.    **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., GREENLEE, WESTBROOKS, McDONALD AND LAWRENCE, JJ., CONCUR.  McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY J. WILSON, P.J., AND TINDELL, J.  C. WILSON, J., NOT PARTICIPATING.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶44.    It is my firm belief that any time there is a genuine dispute whether a statute-of-limitations period has run, that dispute should be resolved by a jury.  *See Miss. Valley Silica Co. Inc. v. Barnett*, 227 So. 3d 1102, 1121 (¶47) (Miss. Ct. App. 2016), *abrogated on other grounds by Portis v. State*, 245 So. 3d 457 (Miss. 2018).

¶45.    But in this appeal I do not believe there was any way the harm was not reasonably discovered by the time the limitations period had expired.  Although I agree with the majority that the "blue sky" claims were waived, I would also affirm the circuit court's grant of summary judgment as to the common-law claims.

¶46.    As the circuit court phrased it, "[t]o discover their injuries, Plaintiffs simply had to glance at their account statements, which would have alerted them to the substantial losses

about which they now complain." In granting summary judgment, the circuit court found it "did not require advanced degrees or financial backgrounds to realize that those statements showed investment activity inconsistent with their objectives."

¶47. If someone plunges a knife into your belly and you start to bleed, you know you have been injured. Each month, the retirees were jabbed by the clearly shown losses in their accounts. Every time they received a statement showing their losses, they knew they were losing money, and it was not getting better—no matter what Savell told them. There was no latent injury to discover, as the wound was apparent. Regardless of the retirees' investment experience, they knew they were losing money throughout the time they were relying on Raymond James.

¶48. Likewise, if a broker continues to tell someone it will get better, and it does not (rather, it gets even worse), the harm cannot be concealed. The lack of latent injury or concealed harm is heightened by the retirees' concession that some of their co-workers had already pursued Raymond James for Savell's failures—and done so within the three years set out by the statute of limitations.

¶49. I am unpersuaded this case is that distinguishable from *Speed v. AmSouth Bankcorporation*, No. 3:04-cv-909-LN, 2006 WL 839546 (S.D. Miss. Mar. 30, 2006). As discussed by the majority, the plaintiffs in that case "knew that they had lost a significant amount of their principal balance, and that their principal was not 'safe' and 'secure' as [their broker] had represented." *Id*. at *3. The majority states that it can be distinguished because the plaintiffs in that case "did nothing," while noting that in the case at hand the retirees complained to Savell.

21

¶50. While the investors in *Speed* did not seek reassurance from their broker, their losses were apparent, and they allowed their investments to continue. *Id*. at *5. The facts that gave them knowledge of a claim, or that a reasonable person would have investigated, were the losses after they had been assured their principal would build. *Id*. This is the same reason the district court concluded the *Speed* investors "failed to exercise any due diligence to attempt to discover their cause of action," so their claims would not be tolled. *Id*. at *7. As the district court concluded, "the law requires that persons act to pursue and protect their rights in a timely manner . . . ." *Id*. at *8. For the same reason, I would affirm that the claims were time-barred in this case.

¶51. A caveat: although both the majority and the circuit court make some reference to a claim by the retirees that Raymond James was negligent in its supervision of Savell, under even the simple and plain standards of Mississippi Rule of Civil Procedure 8, I do not see such a claim in the complaint in this case. Were there such a claim, the discovery rule would undoubtedly apply to it. Although the retirees knew of their financial losses, it would be a question for a jury if those losses were due to failed oversight, and those failures would have been latent.

¶52. For these reasons, I respectfully concur in part and dissent in part.

**J. WILSON, P.J., AND TINDELL, J., JOIN THIS OPINION.**

22